## WARNER *vs.* HITCHINS and LEONARD.

Where a lease contains a covenant on the part of the lessees to surrender up the possession of the premises, at the expiration of the lease, in the same condition they are in at the date of the lease, natural wear and tear excepted, but there is no covenant to repair or rebuild; and the buildings are destroyed by fire during the continuance of the term, the tenants are not bound to put up new buildings in the place of those destroyed.

But where fixtures attached to, and constituting a part of the demised premises, are severed by the fire, and are subsequently carried away by the lessees and not returned, they do not thereby lose their identity, but are fairly within the agreement to surrender at the end of the term; and the lessor may recover their value, in an action upon the lease.

ON the 15th day of May, 1844, the plaintiff, by an agreement not under seal, leased to the defendants a tannery, with its appurtenances, in the village of Lockport; the term to commence on the first day of September, 1844, and to end on the first day of September, 1847. The lease contained, on the part of the defendants, an express agreement to pay the rent, and not to assign without the plaintiff's consent, and also a clause in the following words: "*And also at the expiration of the lease to surrender up the possession of the said premises, in the same condition the same now are, natural wear and tear excepted.*" The lease contained no other express stipulations on the part of the defendants. They went into possession under it, and in January, 1846, the buildings on the premises were destroyed by accidental fire, and have not been rebuilt. Certain fixtures on and a part of the premises leased were severed by the fire, and were subsequently taken off by the defendants and not returned at the time of, or since, the expiration of the term created by the lease. The plaintiff claimed that the defendants were bound to put up new erections; and this action was brought to recover the value both of the property destroyed by the fire and of that removed. The jury assessed separately the damages upon each of these alleged causes of action, and a verdict was taken for the plaintiff subject to the opinion of the court.

*J. L. Curtenius*, for the plaintiff.

*E. J. Chase & L. F. Bowen*, for the defendants.

SILL, J. The most important question in this case arises upon the stipulation in the lease, by which the defendants bound themselves *at the expiration of the lease to surrender up possession of the premises in the same condition they were in at the time of making the lease, natural wear and tear excepted.* Except in one case in the court of appeals of Virginia, I can find no direct adjudication upon this precise question. Substantially the same point was presented to our su-

preme court, in the case of *Cook* v. *The Champlain Transportation Company*, (1 *Denio*, 91 ;) but that case passed off upon another point, and the court gave no opinion on the one here presented. At common law tenants were not liable in waste for losses by accidental, or even negligent fires. By the statute of Gloucester, lessees for life or years were made liable for such losses. The law was again changed, by the 6 Elizabeth, which provided that lessees should not be liable for the loss of buildings which were destroyed during the term by accidental fires, except in cases of special agreement between landlord and tenant. (1 *Coke's Rep. by Thomas*, 644, *note* 19. *Arch. Land. and Ten.* 17. 3 *Chit. Black.* 229, *note.*) And so the English law stood on the subject down to the time of the revolution.

It was at first doubted, under the statute of 6 Elizabeth, as will be seen by reference to the authorities cited, whether *an express covenant to repair* bound the tenant to make good losses by accidental fires. And the practice of inserting a clause excepting such losses from the operation of the covenant was at first adopted by conveyancers in England, on account of this doubt, and to avoid any question about it, and not because the covenant without the exception was understood clearly to extend to such casualties. It is now however settled, that when the lease contains, on the part of the lessee, *an express covenant to uphold and repair* the premises, he is liable to make good such losses. But in all the adjudicated cases where this liability has been held to attach to the lessee, he has entered into an *express covenant to repair ;* and in all those cases in which the same lease has also contained a covenant to surrender the premises in the same condition, or in as good condition, as at the commencement of the term, this covenant has not been noticed by the court as important, but the covenant *to repair* has been made expressly the basis of the recovery. In some early cases, where the lease contained no covenant on either side about replacing buildings casually destroyed, courts of equity restrained the lessor from collecting rent after such losses, or apportioned the rents according to the diminished value

Hitchins *v.* Warner.

of the demised premises. But the rule in such cases is now settled, that if there is an express stipulation on the part of the lessee to pay rent, he is bound to pay for the whole term, and the lessor must suffer the injury to the reversion. (*Holtzapffel* v. *Baker*, 18 *Ves.* 115. *S. C. at law*, 4 *Taunt.* 45. *Patterson* v. *Ackerson*, 1 *Edw. Ch. Rep.* 96. *Fowler* v. *Botts*, 6 *Mass. Rep.* 63. *Hallett* v. *Wylie*, 3 *John.* 48.) The equity of this rule apportioning the loss in some degree according to the interests of the parties, has induced the courts to adhere to it, unless different obligations have been expressly and clearly assumed by the respective parties. Whether these defendants have assumed a different liability is the inquiry in this case.

The intention of the parties prevails over the literal terms of an agreement, when its language is not in accordance with their actual design. To ascertain this intent, we are to look at the situation of the parties; the subject matter of the agreement; the object that the parties had in view and intended, at the time, to accomplish. A construction should be avoided, if it can be done consistently with the tenor of the agreement, which will be unreasonable or unequal. (14 *Verm. Rep.* 311.) And that construction which is most obviously just is to be favored. (4 *Humph.* 468.)

The question in the present case comes to this, whether the defendants are liable on their agreements, to the same extent as though they had covenanted to repair and uphold the premises during the time. "Upon a covenant by the lessee *to keep in repair and leave* the premises in the same state as when he found them, he is merely required *to use his best endeavors* to keep them in the same *tenantable repair*. Natural and unavoidable decay is no breach of the covenant; but a covenant to *repair generally* requires him to uphold the buildings." (*Com. L. & T.* 202.) "If one covenant to keep and leave a house in the same or as good plight as it was at the making of the lease, in this case the ordinary and natural decay is no breach of the covenant. But the covenantor is bound to do his best to keep it in the same plight, and therefore is bound to keep it covered," &c. (*Shep. Touch.* 169.) The same book also lays

down the rule that upon a covenant to repair generally, the lessee is liable to make good losses by casual fire. These authorities show that a covenant to repair differs in its effect from a covenant to surrender in the same condition; and is more extensive in its application. They point to the office and design of these covenants respectively. The stipulation to repair is the proper one where the lessee assumes to keep and make the premises good, from whatever cause the injury may arise, whether from unavoidable accident or negligence. And the covenant to surrender in the same condition is adopted when the object is to secure the utmost care and diligence of the lessee in protecting and preserving the property. The same principle is laid down in 6 *Vin. Ab.* 406, *tit. Cov. L.* 4, § 3. "Covenants ought to be construed according to the intentions of the parties; as if one covenant *to leave all the timber* upon the ground at the expiration of the term, and after cut it down, it is a breach of the covenant, though he take it not away. But if a stranger cut it down it is no breach of the covenant." In this last case the leaving the timber on the ground, though cut down, was a literal compliance with the covenant; but it was held that the real intention was that it should be left standing. The covenant was also in terms absolute, that the timber should be left on the ground, not excepting injuries arising from casualties, or the interference of strangers. Still it is held, that according to the intention of the parties it imposed upon the covenantor only due diligence and care in preserving the timber, and abstinence from any act on his part productive of injury to it. In the same book, title Covenant, L. 5, § 2, it is said, "If a man covenant to leave the land as he found it, and the wind tears up the trees by the roots, the covenant, as to this, is void." In other words, there is no breach, because the parties did not intend that the covenant should cover such an injury; for I shall have occasion to show that if the case were clearly within the intent of the parties, the law does not make such covenant void, but the covenantor would be responsible in damages.

In *Pollard* v. *Shaffer*, (1 *Dallas*, 210,) the lessee covenanted

to keep the premises in good repair during the term, and at its expiration to surrender them up in like good repair. At the end of the term the premises were in the possession of the British army, by whom the buildings had been partially destroyed. It was held that the covenant was not broken. It is proper to say that on account of the express covenant to *repair,* the soundness of this case has been questioned. And it is upon this ground alone, I apprehend, that the correctness of the decision has been doubted. In *Ellis* v. *Welsh,* (6 *Mass. Rep.* 246,) the defendant had leased to the plaintiff a store, and covenanted that he " should hold and occupy the same for five years from," &c. During the term part of the premises on which the building stood was taken for a street. It was held that the covenant did not extend to such a disturbance, and was not broken. The same question was decided the same way in *Frost* v. *Ernest,* (4 *Whart.* 86 ;) and the same point has also been so decided in several instances by our supreme court. In *Knickerbacker* v. *Killmore,* (9 *John.* 106,) the action was covenant by the assignee against the assignor of a lease. The assignment to the plaintiff purported to sell, assign, transfer and set over to him, all the parcels of land and premises described and contained in the lease, to have and to hold the same to the plaintiff, in as ample a manner to all intents and purposes as the assignor himself might or could hold or enjoy the same ; and also contained a covenant by the assignor to the assignee in the following words : "And further, that I do covenant with the said P. K. that I have good and lawful right to bargain and transfer the said premises as above written." The plaintiff was evicted by title paramount to that of the assignor, and the court held that the case was not within the covenant, which was intended only as a covenant against the acts of the covenantor. In *Graves* v. *Clark,* (8 *Cowen,* 36,) the action was upon an implied covenant in a lease. The court said that the words *demise and grant* implied a covenant upon the part of the lessor, that the lessee should have quiet and peaceable possession of the demised premises, on the day the term commenced. On that day there was a person in pos-

session without right, who refused to give it up. It was held that the covenant was not broken. For, although the covenant implied would strictly embrace the case, it was by construction limited to a case of holding out by the lessor, or some one having title. *Gardner* v. *Keteltas,* (3 *Hill,* 330,) presents the same point, (the covenant in that case being express,) and the decision is the same. In *Dudley* v. *Folliot,* (3 *T. R.* 584,) the action was upon a covenant in a deed of conveyance of land lying in the state of New-York. The defendant covenanted that he had the legal title, and that the grantee, his heirs and assigns, should and might forever thereafter peaceably have, hold, occupy, possess and enjoy the premises with the appurtenances, &c. without the let, *trouble, hindrance, molestation, interruption* or *denial* of him the defendant or his heirs, or of and from *all and every other person or persons whomsoever.* The state of New-York had seized the land as forfeited by acts of the grantor, done prior to the execution of the deed, and possession by the grantee could not for this reason be obtained. The court of king's bench decided, that the covenant was only against lawful interruptions, and not recognizing the proceedings of the state as legal, held that the covenant was not broken. In *Stanley* v. *Hays,* (3 *Adol. & Ellis, new series,* 106,) the action was upon a covenant for quiet enjoyment during the term. The lessee's property was distrained for a tax assessed on the land, before the lease was made, and which the lessor was bound to pay. It was held there also that the covenant was not broken, and that it extended only to a disturbance by one having an interest in the land demised.

In *Lindsey* v. *Gordon and others,* (1 *Shepley,* 60,) the action was for refusing to deliver to the plaintiff a vessel for which, upon a sale to them, he had received the notes of the defendants. They agreed " to keep said vessel in good order, and to deliver her up to said Lindsey, or his order, on failure by us to pay the notes aforesaid, or any one of them." The vessel was lost at sea. And the court said the vessel being lost without the defendants' fault, the re-delivery was excused, and no action lay against them therefor.

Hitchins v. Warner.

Cases in principle like these, almost without number, might be cited; and I refer to them, not claiming that the analogy between them and the present case is so decisive as necessarily to dispose of it, but for the purpose of bringing directly before the mind a few examples, where the unquestioned terms of the contract have been made to yield to what the courts have deemed the intentions of the parties, and showing how freely and extensively the power of conforming the language of an agreement by construction, to the actual design of the parties making it, has been always exercised by the courts. In all the cases cited, the departure from the language of the contract, was as great, and in some far greater, than the defendants propose here.

The construction applicable to covenants like most of those before the courts in the various cases cited, has long been settled and understood. But when the questions there decided were first presented, I know of no argument that can now be used against the defendants in this case, which would not have applied then with equal if not greater force. The difficulty is not that the principle is now for the first time asserted, but that we are now for the first time called on to apply it to a case like the present.

In looking at all the circumstances of the case, I am satisfied that neither party contemplated, at the time the lease was executed, that the tenants were to rebuild the erections, in case of their destruction by fire. This liability is an extraordinary one for the lessee to assume, and when it is intended, it is usually expressed in terms not susceptible of misconstruction. The covenant to repair has been in use for centuries; its appropriate office and design is understood, not only by lawyers but laymen, and its omission is a strong reason for supposing that neither party intended, by other provisions, to assume or impose the obligations which it creates. The covenant to repair has always been regarded as imposing a more extended liability, than the covenant to surrender the premises in as good condition as found. And the insertion of the latter covenant has never been considered as superseding the necessity of the former

when the intention is to charge the tenant with repairs; even those not made necessary by casualty. The damages claimed by the plaintiff, are all he would be entitled to under an express agreement to repair and uphold the premises during the term; and to give him this remedy, we must virtually interpolate a stipulation to that effect by the side of those which the parties themselves have placed in the lease. It is only by implication that a contract to surrender the premises in the same condition, can he held to bind the lessee to rebuild; thus enlarging instead of restraining the signification of the words of the agreement, for which I find no authority. "Where one covenants expressly to perform certain acts, he *does not*, by *implication*, covenant to do every act, convenient or necessary for the performance of the express covenant. The courts will not imply a covenant which is merely a convenient addition to what is expressed." (*Ashdue* v. *Austin*, 5 *Ad. & El.* 671, *N. S.*)

Again; the language here used is that the *said premises* shall be surrendered in the *same condition*—not in *as good* a plight or condition. I am not about to attempt a subtle distinction between the legal signification of these terms; for where the intention is clear the obligation imposed would probably be the same, whichever phrase was used. But when we are trying to present to our minds the views that occupied those of the parties when the contract was made, the form of expression used by them, may in some degree aid us in the attempt. Had they intended to provide for such a casualty as happened, and. not merely for the protection and preservation of the building then standing, it would have been much more natural to provide for leaving the premises in as good a condition, than for surrendering them in the same condition. This form of expression tends to show that the contingency of a destruction by fire was absent altogether from the minds of the contracting parties; or, if it was thought of, that a stipulation in relation to it was intentionally omitted. It is not claimed that this is a controlling circumstance in the case, but with others it is worthy · of consideration in our inquiry after the object which the insertion of this stipulation in the lease was proposed to secure.

Again ; it is to be remarked that the obligation which the plaintiff asserts is a hard and unequal one. It is in itself unreasonable and inequitable, and entirely different from any liability which the law, in the absence of an express agreement, imposes on a tenant. To subject him to such liability his agreement should be explicit, and free from doubt. Had the *plaintiff* agreed, in the lease, that during the term the *defen-dants* should quietly and peaceably have, use and enjoy the land and buildings demised, the words of such an agreement would as plainly obligate the plaintiff to put up new erections, as the terms of the defendants' contract would subject them to that burden. The cases cited above, and numerous others, show that no such liability would rest upon the lessor, and that nothing short of an express covenant to repair or rebuild, would impose this obligation on him. It would be hard indeed if the lessee is to be held by a rule of construction which the lessor is at liberty to repudiate.

We are referred to the rule that the terms of a contract are to be taken most strongly against the covenantor, and are told that the exception in the case of ordinary wear and tear, should be interpreted as excluding an intention to make any other exception. That such have been laid down as rules of construction is not to be denied. The cases I have referred to show how easily and how frequently these rules have been departed from, and that their influence is allowed, when it leads to a just and equitable construction. In my opinion, they should never be allowed to lead the court to an inequitable or harsh one. But the answer to the argument is, that these rules are subordinate to principles; that the intention of the parties is to be sought after and effectuated by the court.

I do not propose to examine, in detail, the cases cited by the plaintiff's counsel to sustain his position. So far as they are claimed to bear directly on the question they are all, as before remarked, cases where the lessor had *covenanted to repair*, and are for this reason distinguishable from this case. Shepherd's Touchstone, 173, has also been cited as an authority for holding the defendants liable. It is there said, " If one covenant to

repair houses or banks, *or covenant to leave them in as good case as one doth find them,* and the houses are burnt, or blown down by a tempest or the like accident, in this case the covenant is not broken by the accident only; but if the covenantee doth not repair and make up these things in a convenient time, the covenant will be broken." It is urged that this author intended to lay down the rule that the lessee would be liable to repair on a covenant like the present agreement. The authorities cited by Shepherd, and upon which his remarks are founded, are Dyer, 33, 40 Edw. 3, 5, and Plowden, 29. A reference to these cases shows that no such thing was intended, but that he was speaking of the *time when,* in such cases, the covenant would be considered broken. The case in Dyer shows that there was an express covenant " to sustain and repair the banks to prevent the water from overflowing." The banks were broken down by a great and sudden flood, and although the terms of the contract required the defendant to *sustain* the banks, and *prevent* the water from coming in, still the court held that the covenant was kept by repairing within a convenient time, and that it was not broken until such time had elapsed. The decision in 40 Edward, is stated in Fitzherbert's Natura Brevium. In that case there was also a covenant to repair *and* surrender in good repair. And the question was whether the covenant was broken before the end of the term, if in the mean time the lessee neglected to make repairs; and it was held it was not. What is said in Plowden is as follows : " If houses are leased for years, and are thrown down by the violence of the wind, the law will excuse the lessee in waste. But if he covenants to repair *and* leave them in as good repair at the end of the term, an action of covenant will lie against him for the repairing thereof, for *the special* agreement alters the law." This also is said by the counsel arguing, and not by the court; although its correctness will not be questioned. The author of the Touchstone intended to state the principles laid down in these cases, and they show what he meant. What he says is applicable to a case in which there is a covenant to repair *and* surrender in good repair, and not to the latter stipulation standing alone. In late

editions of the Touchstone, 1 Coke, 98, and 5 Coke, 15, are added to the authorities cited by Shepherd himself; but they have no application to this case. Authorities were referred to on the argument, showing, *as was conceded*, that upon a contract like this, no liability will arise when the loss happens by the act of God. It was said on the part of the plaintiff, that the law made a distinction between such a case and the present one, and *excused* the breach when the covenant became impossible to be performed from providential causes. There has been language used by some elementary writers, and in some of the cases, furnishing plausible grounds for this argument. But in my opinion no such distinction in principle really exists. The rule is, that if at the time the covenant is entered into, circumstances exist which show that it is impossible that it can be performed, it is void. "But if the covenant be within the range of possibility, however absurd or improbable the idea of the execution of it may be, it will be upheld; as where one covenants it shall rain tomorrow, or that the pope shall be at Westminster on a certain day. To bring the case within the rule of dispensation it must appear that the thing to be done cannot by any means be accomplished; for if it be only improbable, or out of the *power of the obligor*, it is not in law deemed impossible." (*Beebe* v. *Johnson*, 19 *Wend.* 502. 3 *Com. Dig.* 93. 1 *Roll. Abr.* 419.) When the law creates a duty, the party is excused if it becomes impossible to perform; but when he takes the charge upon himself, by his own special agreement, if the thing *become impossible* to perform, he is answerable in damages. (*Platt on Cov.* 582.) Mr. Story goes so far as to say that, if a man contract to perform an impossibility, he is liable in damages resulting from the non-performance. (*Story on Cont.* § 668.) The doctrine of this and other authorities is this : A contract to do a thing, or that a certain thing shall or shall not happen, is binding, provided performance is not at the time of entering into the contract impossible. An agreement that buildings or trees standing on demised premises shall not be destroyed during the term from providential causes is not void; and if they are blown down by a tempest or de-

stroyed by lightning, the covenantor is liable in damages. The question in all these cases is how far the parties intended the covenant to extend ; and where it has been incautiously said by courts that the law will *excuse* non-performance, when by the act of God performance has become impossible, the real defence has been that the parties did not by their contract intend to provide against such losses, and hence the agreement was not broken. Courts may be less inclined to hold that providential losses were within the intent of the parties, than those arising from other causes ; but when the intent is ascertained, the principle of law applicable in either case is the same. If this case were to be determined without reference to any decisions other than those already noticed, I should be of the opinion that the defendants were not liable for the building destroyed. But there are some other cases which seem to me to bear directly upon the question, to which I will now refer.

It has been decided by the courts of the state of Tennessee, where A. covenanted to deliver B. his growing crop of cotton "in good order put up in bags," that A. was not bound to deliver the cotton free from stains, and of a fair quality. He was only bound *to use his utmost care in putting*, ginning, and baling it. And that he did not guaranty against the casualties of the season. (*Trigg* v. *Hally,* 4 *Humph.* 493.) Here was an express contract to deliver in good order, which was not according to its terms, performed. Yet the court, looking at the intent of the parties, hold that the real understanding was that A. should use his utmost care in preserving the property, and was not liable for casualties. A contract to deliver cotton, and one to deliver the possession of a house, are alike in character, and if a guaranty against casualties is not implied in one, upon what principle can it be implied in the other ? If the cotton had been destroyed by flood or fire, without the defendant's fault, I am unable to see why, upon the principle of that case, he would not have had equally a defence.

The hirer of a slave covenanted to re-deliver him to the bailor at the end of the term. During the term the bailee moderately corrected him for misconduct ; upon which the slave ran away,

and notwithstanding due diligence on the part of the bailee to recover him, he escaped and was not delivered to the bailor. It was held that the bailee was not liable on his covenant for the value of the slave. (*Graham* v. *Swearingin,* 9 *Yerger,* 276.) The principle of this case cannot be misunderstood. The covenant to return the slave was in terms unconditional, and literally it was broken. But it was construed to be only an undertaking on the part of the bailee to use his utmost care and diligence to keep and return the slave. In the court of appeals of the state of Virginia construction was given to a covenant like the agreement before us. A lessee covenanted "to return the property, with all its appurtenances, at the end of the term." During the continuance of the lease a grist mill and saw mill and carding machine, a part of the demised premises, were consumed by fire, and the lessor brought his action on the covenant, for the value. It was held that it was merely a covenant not to hold over, and the lessee was not responsible for the property destroyed. Upon this point the court say, "to bind him to something so unequal and so contrary to the obligations imposed by the common law, his covenants ought to be *special and express,* and so clear as to leave no doubt that he intended to take this duty or charge on himself. Nothing should be left to vague inference or doubtful construction. (*Maggort* v. *Hansberger,* 8 *Leigh,* 532.) These decisions I conceive to be directly in point; and though not binding authority, are entitled to high respect, and I am unable to discover that they are not sound in principle.

In *Browning* v. *Hanford,* (5 *Hill,* 596,) a question somewhat like the one before us was presented to the court, though not decided. Property had been levied on by a sheriff, and delivered to one Ellsworth, from whom he took a receipt, and an express agreement to re-deliver it on demand or pay $2000. The property was destroyed by fire while in Ellsworth's possession. Judge Nelson and Judge Cowen differed on the question of the receiptor's liability. Upon this point Judge Bronson gave no opinion. The case is not therefore cited as authority, but the reasoning of Mr. Justice Nelson is referred to as favoring the

views I have taken of this case.   He said the contract was not to be construed to make the defendant liable for losses arising from unavoidable calamity, and that the view was sustained by a respectable body of authority.   We are also reminded by the plaintiff's counsel, that a contract should, when susceptible of two constructions, receive that which will make it legal and operative, rather than that which will render it illegal and nugatory; and we are told that this rule will be infringed, unless the defendants are held liable for the property destroyed; that a different construction will bind them to no duty which the law itself does not impose.   And hence the agreement will be inoperative.   A contract is not inoperative within the meaning of this rule simply because the obligation it imposes is the same which the law implies.   A bond or promissory note, by which a party binds himself to repay borrowed money on demand, is neither nugatory nor inoperative.   Yet the same liability is in such case implied by law, which is expressed by these instruments.   No case, I apprehend, can be found where a more comprehensive interpretation has for this reason been given to a contract than it would otherwise receive.   On the contrary, the reasoning of Mr. Justice Nelson in *Brown* v. *Hanford* tends to the conclusion that where the language of a contract is appropriate to express a duty which the law imposes, it should not be construed to create an additional obligation.   After a most careful examination of the question, I am of the opinion that the defendants were not bound by their agreement in the lease to put up new buildings in the place of those destroyed.

As to that portion of the property not destroyed, but removed from the premises, I think the plaintiff is entitled to recover.   The objection that a breach for this cause was not assigned in the declaration seems to me not well taken.   This property was a part of the premises demised to the defendant, and was in existence at the end of the term, or at least was *removed* by the *defendants* before.   Nothing was shown to excuse them from returning it.   I do not understand that the plaintiff is driven (as has been contended) to his action of trover for it.   He might maintain such an action probably; but I think he is at

---

liberty to elect to go on the agreement.   Numerous cases might be cited where a lessee has been held liable on his covenant for property severed from the freehold by him and carried away ; and this property, a portion of it having been severed by the fire, did not lose its identity, but remained a portion of that covered by the lease, and was fairly within the agreement to surrender at the end of the term.   Had there been no such agreement, the plaintiff would have been left to his action on the case ; but as it is I think the suit for the claim may be sustained.

The plaintiff must have judgment for the value of the property which the defendants have removed and not returned, which the jury found to be worth $275

MULLETT, P. J. concurred.

MARVIN, J. dissented.                                     .;;

