# IN THE SUPREME COURT OF TEXAS

════════════

No. 14-0086

════════════

PHILADELPHIA INDEMNITY INSURANCE COMPANY, A/S/O MIRSAN, L.P., D/B/A
SIENNA RIDGE APARTMENTS, PETITIONER,

v.

CARMEN A. WHITE, RESPONDENT

═══════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════════════

**Argued October 13, 2015**

JUSTICE GUZMAN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE JOHNSON, and JUSTICE BROWN joined.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE WILLETT, JUSTICE LEHRMANN, and JUSTICE DEVINE joined.

JUSTICE DEVINE filed a dissenting opinion.

Texas's strong public policy favoring freedom of contract is firmly embedded in our jurisprudence. Absent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered. *See, e.g.*, *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 503-04 (Tex. 2015); *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 664 (Tex. 2008); *Wood Motor Co. v. Nebel*, 238 S.W.2d 181, 185 (Tex. 1951). In the residential-leasing context, privilege of contract is circumscribed by statute, but the restraint the Legislature chose is limited and exceptions exist. *See* TEX. PROP. CODE §§ 92.006, .052; *Churchill*

*Forge, Inc. v. Brown*, 61 S.W.3d 368, 370, 373 (Tex. 2001) (observing that the Texas Property Code restricts freedom of contract in residential tenancies). Today, we determine, as a matter of first impression, whether public policy embodied in the Texas Property Code precludes enforcement of a residential-lease provision imposing liability on a tenant for property losses resulting from "any other cause not due to [the landlord's] negligence or fault."

At issue here is a tenant's responsibility for property damage sustained in a fire that originated in a tenant-owned clothes dryer stuffed with dry, unwashed bedding and pillows. A jury failed to find the tenant negligent in causing the fire, but held the tenant contractually liable for the loss under the terms of the lease agreement. The tenant filed a motion for judgment notwithstanding the verdict, asserting several grounds for avoiding enforcement of the contract. The trial court granted the tenant's motion without stating the basis and rendered a take-nothing judgment. In a split decision, the court of appeals affirmed, concluding the lease provision broadly and unambiguously shifts liability for repairs beyond legislatively authorized bounds and is, therefore, void and unenforceable. 421 S.W.3d 252, 256, 258 (Tex. App.—San Antonio 2013).

Though we agree the lease language does not expressly incorporate statutory carve-outs, we cannot say the contract is unenforceable on public-policy grounds because (1) the disputed lease provision can be enforced without contravening the Property Code and (2) the record here does not conclusively establish the factual predicate necessary to preclude its enforcement. We therefore affirm the court of appeals' judgment as to ambiguity, but reverse in part and render judgment that, on the record before the Court, the lease provision is not void and unenforceable. Because the court of appeals did not address the tenant's other defenses to enforcement, we remand the case to that court for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Carmen White executed a Texas Apartment Association (TAA) form lease in which she agreed to reimburse her landlord for all property losses not resulting from the landlord's negligence or fault (the Reimbursement Provision). Section 12 of the lease provides, in pertinent part:

> **DAMAGES AND REIMBURSEMENT.** You must promptly pay or reimburse us for loss, damage, consequential damages, government fines or charges, or cost of repairs or service in the apartment community due to: a violation of the Lease Contract or rules; improper use; negligence; *other conduct by you or your invitees, guests or occupants; or any other cause not due to [the landlord's] negligence or fault.* You will indemnify and hold us harmless from all liability arising from the conduct of you, your invitees, guests, or occupants, or our representatives who perform at your request services not contemplated in this Lease Contract. **Unless the damage or wastewater stoppage is due to our negligence, we're not liable for–and you must pay for–repairs, replacements and damage to the following if occurring during the Lease Contract term or renewal period: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment.**

(First emphasis added.)

Shortly after White moved into her apartment, she received a new washer and dryer as a gift from her parents. She successfully connected the washer, but abandoned her efforts to install the dryer because the cord sparked and the circuit breaker tripped when she attempted to plug it into the receptacle. At White's request, an apartment-complex employee later connected the dryer to the unit's pre-existing utility connections via a cord White supplied.

Within days of the dryer's installation, White's apartment and several adjoining units were severely damaged in a fire that originated in her apartment. White first detected the fire in the clothes dryer, which she had been using to remove allergens from dry and unwashed items, including a duvet,

3

sheets, a blanket, decorative pillows, and a bed pillow. Though the fire started in the dryer drum, the source of ignition is unknown. White was unable to extinguish the fire, and the ensuing casualty loss exceeded $83,000.

Philadelphia Indemnity Insurance Co. paid the landlord's insurance claim and demanded reimbursement from White. White failed to remit payment, and Philadelphia Indemnity sued her for negligence and breach of contract for noncompliance with the Reimbursement Provision.

At trial, mechanical and electrical malfunction of the dryer, cords, power outlet, and circuit breaker were excluded as causes by a testifying expert. But the parties disputed whether some of the items placed in the dryer contained materials not suitable for mechanical drying, and a chemist testified that a sample of the dryer contents "consisted of cotton fibers, [was] negative for ignitable liquids, and contain[ed] 0.1 percent hexane extractible material by weight and contain[ed] the residue of a vegetable oil." The dryer's instruction manual warns: "Do not place items exposed to cooking oils in your dryer. Items contaminated with cooking oils may contribute to a chemical reaction that could cause a clothes load to catch fire."

Following the close of evidence, the following broad-form liability questions were submitted in the jury charge:

> Question No. 1: Did the negligence, if any, of [White] proximately cause damages to the Sienna Ridge Apartments.
>
> Question No. 2: Did [White] violate the terms of the Apartment Lease Contract . . . .

Neither party requested a question to determine the fire's cause or whether it was attributable to non-negligent conduct on White's part.

The jury answered "no" to the first question, failing to find that White's negligence proximately caused the fire. In answering "yes" to the second question, the jury found White breached the lease agreement by failing to pay for the casualty loss and, in doing so, necessarily found the landlord did not negligently cause the fire. Based on the affirmative finding that White breached the lease agreement, the jury awarded $93,498 in actual damages and attorney's fees to Philadelphia Indemnity.

White moved for judgment notwithstanding the verdict, asserting a variety of grounds for avoiding enforcement of the Reimbursement Provision, including ambiguity and public policy.[1] The trial court granted the motion without specifying the grounds and rendered a take-nothing judgment.

A divided court of appeals affirmed, rejecting White's ambiguity defense, but holding the Reimbursement Provision void as against public policy. 421 S.W.3d at 256, 258. In declining to enforce the parties' bargain, the majority found a fatal conflict between the Reimbursement Provision's broad language and Property Code provisions delineating particular circumstances under which landlords owning more than one rental dwelling and their tenants may contractually allocate repair responsibilities. *See id.* at 257-58 (citing TEX. PROP. CODE §§ 92.006, 92.052(b) and *Churchill Forge*, 61 S.W.3d at 370-73). The court declared the Reimbursement Provision void because it plainly "makes a tenant liable for damage to the entire apartment complex for accidental losses, acts of God, criminal acts of another, or any other act of someone or something unassociated with the tenant or [landlord]," *id.* at 256, whereas the Property Code prohibits landlords from waiving their

---

[1] The other grounds included lack of consideration, unconscionability, violation of the fair-notice doctrine, and improper establishment of a new strict-liability theory.

5

repair duties under subchapter B, which covers conditions materially affecting the physical health or safety of the ordinary tenant, except for:

> (1)    conditions caused by the tenant or an affiliated party;[2]
>
> (2)    three specific categories of repairs set forth in section 92.006(f), subject to specificity, conspicuity, and other prerequisites; and
>
> (3)    any condition covered by subchapter B if the landlord owns only one rental dwelling at the beginning of the lease term and specificity, conspicuity, and other prerequisites are satisfied.

*Id.* at 258 & n.3 (citing TEX. PROP. CODE §§ 92.006(c)-(f), .052(b) and *Churchill Forge*, 61 S.W.3d at 373). Because the third category is inapplicable to the present dispute, the court of appeals observed that the Legislature has not sanctioned "the imposition of contractual liability on a tenant for any and all damages to the apartment complex whenever the damages are not caused by the landlord." 421 S.W.3d at 258. Because the Reimbursement Provision encompasses scenarios in which the Legislature has not expressly authorized a landlord to contractually shift repair responsibility to a tenant, the court determined the lease provision is incompatible with public policy reflected in the Property Code. *Id.* The court also summarily determined that the damages at issue were not tenant-caused based on the jury's failure to find White's negligence proximately caused damages to the apartment complex. *Id.* at 258 & n.4.

In a dissenting opinion, Justice Barnard addressed each of White's challenges to contract enforcement and concluded that none had merit. *Id.* at 259-63 & n.2. With regard to public policy,

---

[2] In this opinion, references to tenant cause include conditions caused by a lawful occupant in the tenant's dwelling, a member of the tenant's family, or a guest or invitee of the tenant. *See* TEX. PROP. CODE § 92.052(b).

Justice Barnard construed our opinion in *Churchill Forge* as repudiating any notion that contractual liberty is constrained to tenant-caused damages and those circumstances specifically enumerated in the Property Code. *Id.* at 260 (citing *Churchill Forge*, 61 S.W.3d at 371).

On appeal to this Court, the parties focus their attention on White's ambiguity and public-policy defenses to contract enforcement.[3] The crux of the public-policy argument concerns the relationship between section 92.006(c) of the Property Code, which generally prohibits waiver of statutory repair duties and remedies, and section 92.052, which delineates the landlord's duty to repair or remedy conditions materially affecting the physical health or safety of an ordinary tenant. In *Churchill Forge*, we held: (1) Section 92.006(c) does not restrict freedom of contract unless the landlord has a duty to repair, and (2) under section 92.052(b) a landlord has no duty to repair conditions "caused by" the tenant. *Churchill Forge*, 61 S.W.3d at 371-72 (citing TEX. PROP. CODE §§ 92.006(c), .052(b)). If the landlord has a repair duty and section 92.006(c) is therefore implicated, section 92.006(d)-(f) describes permissive contractual arrangements excluded from the general prohibition. The parties agree that none of the permissive exceptions to section 92.006(c) apply in this case. The main points of disagreement are (1) what White must prove to establish the landlord's repair duty as a predicate to invoking the statutory prohibition that undergirds her affirmative defense, and (2) whether the permissive exceptions to the general prohibition are exclusive.

Citing our opinion in *Churchill Forge*, Philadelphia Indemnity argues section 92.006's list of authorized contractual arrangements is permissive, but not exclusive, and the Property Code neither prohibits agreements making tenants responsible for damages accidentally caused by their

---

[3] The parties also touch on White's other contract-avoidance defenses, but the court of appeals did not consider those issues, and we decline the invitation to address them at this time.

own appliances nor requires tenant fault to shift responsibility for tenant-caused damages. *See* 61 S.W.3d at 371 (stating, when discussing section 92.006, that "[l]egislative permission to contract under certain circumstances does not necessarily imply that contracting under other circumstances is prohibited"). Even if the permissible arrangements identified in section 92.006(d)-(f) are exclusive, Philadelphia Indemnity contends White did not prove the anti-waiver provision in section 92.006(c) applies because (1) White bears the burden of establishing the contract's invalidity as an affirmative defense, (2) damages caused by a tenant's appliances are "caused by" the tenant within the meaning of section 92.052(b), and (3) White failed to obtain a jury finding on an alternative cause of the fire. *See id.* at 372-73 (agreements between parties concerning tenant-caused damages are excluded from section 92.006(c)'s non-waiver prohibition); *see also* TEX. PROP. CODE § 92.052(b) ("[T]he landlord does not have a duty . . . to repair or remedy a condition caused by [the tenant or an affiliated party]."); *cf. McAnally v. Person*, 57 S.W.2d 945, 949 (Tex. Civ. App.—Galveston 1933, writ ref'd) (party seeking to avoid liability under agreement has the burden to plead and prove facts making it unlawful, unless the agreement is facially invalid).

White's primary complaint is that the Reimbursement Provision broadly imposes no-fault liability without requiring any causal nexus. White distinguishes our opinion in *Churchill Forge* as involving a materially different contract provision that was expressly limited to damages negligently caused by the tenant. White also cites *Churchill Forge* as affirming that a landlord seeking to avoid the waiver proscription in section 92.006(c) bears the burden of establishing the tenant caused the damage. *See Churchill Forge*, 61 S.W.3d at 372 ("Without showing that the damage was caused by the tenant, the landlord would otherwise have a duty to bear the cost of repair[ing] [the specific conditions described in 92.006(f)] . . . [a]nd under 92.006(c), that duty could not be waived."). White

therefore argues that absent proof of fault on the tenant's part, the landlord has a duty to repair any damages the tenant caused. Because the jury answered the negligence question in White's favor, she asserts her landlord bore a non-waivable duty to repair the premises condition under section 92.006(c).

We granted Philadelphia Indemnity's petition for review to address these important matters because the Reimbursement Provision is part of a TAA-approved form lease agreement used in countless rental arrangements throughout the state.[4] Several amici[5] have also weighed in on the controversy, highlighting the potential impact on residential leasing.

## II. DISCUSSION

As a general rule, parties in Texas may contract as they wish so long as the agreement reached does not violate positive law or offend public policy. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004). In the residential-leasing context, the Legislature has limited the freedom of landlord and tenant to contractually allocate responsibility for repairs materially affecting health and safety but, importantly, has decided as a matter of public policy not to impose a categorical prohibition on such contracts. *See* TEX. PROP. CODE §§ 92.006 (limitations on waiver or expansion of duties and remedies), .061 (statutory repair duties and remedies under subchapter B of the Property Code are in lieu of other common-law and statutory warranties, landlord duties, and tenant remedies); *see also Churchill Forge*, 61 S.W.3d at 370, 372-73 ("[s]tatutory limitations on the freedom of landlord and tenant to contract are contained in . . . section 92.006 [of the Property Code]," but not

---

[4] Above the signature block, the lease prominently states that the lease can be modified by agreement of the parties, but neither party requested modifications to the Reimbursement Provision's terms.

[5] The Texas Apartment Association, the Texas Tenants' Union, and Southern Methodist University's Civil Legal Services Clinic.

all responsibility-shifting arrangements are prohibited); *see also Fairfield Ins.*, 246 S.W.3d at 665 ("The Legislature determines public policy through the statutes it passes."). Recognizing the Property Code's statutory limitations, we explained in *Churchill Forge* that a landlord owning more than one rental dwelling "cannot ask a tenant to pay for repairs that the landlord has the duty to make," but (1) "[e]xcepted from that dictate . . . are three specific kinds of repairs that the parties can, by contract, shift the duty to pay for from the landlord to the tenant" and (2) "not covered by that dictate are those agreements between the parties concerning damages for which the landlord has no duty to repair, i.e., tenant-caused damages." 61 S.W.3d at 373. Applying this framework, we held that a contract specifically allocating the risk of tenant-caused damages to the tenant did not violate public policy even though the Property Code did not overtly authorize such an agreement. *Id.*

Unlike the lease provision in *Churchill Forge*, however, section 12 of White's rental agreement is not limited to tenant-caused damages, but by negative reference assigns responsibility to her for all damage not caused by the landlord's negligence or fault. Distinguishing *Churchill Forge*, the court of appeals held that the Reimbursement Provision is adverse to public policy expressed in the Property Code because (1) the provision is unambiguous and not explicitly limited to either the exception or the exclusion noted in *Churchill Forge*; (2) the provision's broad language permits tenant-liability scenarios not specifically authorized in the Property Code; and (3) the jury determined the damages at issue were not proximately caused by White's negligence. 421 S.W.3d at 256, 257-58.

The dispute between White and Philadelphia Indemnity ultimately centers on the Property Code's express allocation of the repair duty between landlords and tenants and the liberty to strike a different bargain. We define the overarching issues as (1) whether section 12 of White's lease

10

agreement unambiguously imposes liability for the disputed damages; (2) if so, whether the agreement runs afoul of public policy embodied in the Property Code;[6] and (3) whether the jury's failure to find that White's negligence proximately caused the property damage affects the disposition.

The public-policy and ambiguity analyses are interrelated because we must ascertain the contract's meaning before we can determine whether it conflicts with the Property Code. Our initial inquiry, therefore, is whether the lease provision clearly and unambiguously shifts responsibility to White for the damages at issue. *See Fairfield Ins.*, 246 S.W.3d at 655 (first step in determining whether public policy precludes subject matter of a contract involves ascertaining the contract's scope). We then consider whether the statutory provisions governing the landlord-tenant relationship embody a legislative policy prohibiting the landlord from contracting with White to shift responsibility for the casualty loss at issue in this case. *Id.* (second step in public-policy analysis requires consideration of explicit legislative policy decisions and, in the absence of such, consideration of the general public policies of Texas); *see also* TEX. PROP. CODE § 92.061 (statutory duties and remedies under subchapter B are in lieu of other common-law duties and remedies but do not otherwise affect rights under other laws that are not inconsistent with statutory purposes).

---

[6] Whether characterized as a matter of contract illegality, as the dissenting justices assert, or a matter of public policy, as presented by the parties and determined by the court of appeals, the question is whether the Texas Property Code, expressly or implicitly, prohibits the parties' cost-shifting agreement. If either, the agreement contravenes public policy. *See Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 663, 665 (Tex. 2008) (recognizing that agreements the Legislature has declared illegal are against public policy).

## A. Ambiguity

A contract is ambiguous if it is subject to two or more reasonable interpretations. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). But when a contract provision is worded so that it can be assigned a definite meaning, no ambiguity exists, and we construe the contract as a matter of law. *Id.*

Although the language in the Reimbursement Provision is clear and definite, White points to an apparent redundancy she contends creates ambiguity as to the provision's actual scope. White finds equivocality in the juxtaposition of a clause imposing broad, nonspecific liability with a clause that identifies specific categories of losses for which the tenant is liable without regard to fault or causation.

On one hand, the Reimbursement Provision distinctly imposes responsibility for (1) damage to doors, windows, or screens, (2) damage from windows or doors left open, and (3) damage from wastewater stoppages caused by improper objects, unless the damage or wastewater stoppage is due to the landlord's negligence.[7] On the other hand, the provision includes "catchall" language capturing losses resulting from "any cause not due to [the landlord's] negligence or fault." White thus questions why the contract singles out *specific* losses for reimbursement absent landlord fault if the catchall language makes the tenant responsible for *all* loss in the same circumstances. White also points out that specific losses are emphasized by language that is both bolded and underlined, while

---

[7] This portion of the Reimbursement Provision generally tracks section 92.006(f) of the Property Code, which permits a landlord to shift to the tenant the cost of remedying specific conditions even if those conditions are not caused by the tenant or an affiliated party. *See* TEX. PROP. CODE § 92.006(f) (a permissive exception to section 92.006(c)'s general prohibition against waiver of the landlord's repair duties and tenant's remedies); *Churchill Forge, Inc. v. Brown*, 61 S.W.3d 368, 372 (Tex. 2001) (observing that the specific conditions "resemble those tenant-caused conditions which a landlord [otherwise] has no [statutory] duty to repair, or pay to repair").

the ostensibly broader catchall language—which would subsume the specific losses—is less conspicuously presented. White discerns ambiguity in the catchall language's meaning, arguing it potentially imposes significant liability on tenants while receiving relatively obscure treatment in relation to a more specific subclass of repairs.

Though we strive to construe contracts in a manner that avoids rendering any language superfluous, redundancies may be used for clarity, emphasis, or both. *Cf. In re Estate of Nash*, 220 S.W.3d 914, 917-18 (Tex. 2007) ("[W]e should avoid, when possible, treating statutory language as surplusage, [but] there are times when redundancies are precisely what the Legislature intended." (internal citation omitted)). All things considered, we cannot discern any construction of the catchall provision other than the one it so plainly commands: White is contractually obligated to reimburse the landlord for all damage not due to the landlord's negligence or fault. We therefore agree with the court of appeals that the Reimbursement Provision is unambiguous.

We turn now to the principal issue, which is whether the Property Code precludes judicial enforcement of the Reimbursement Provision. We begin our analysis with a brief discussion of the common-law backdrop against which the Property Code exists, which provides meaningful context.

### B. No Common-Law Prohibition Against Covenants Imposing Tenant Liability for Repairs without Regard to Fault or Negligence

As part of a historically agrarian society, the relationship between a landlord and tenant was, at its most basic level, a tenant's promise to pay in exchange for the bare right to possess the property. *Kamarath v. Bennett*, 568 S.W.2d 658, 660 (Tex. 1978), *superseded by statute*, Act of May 28, 1979, 66th Leg., R.S. ch. 780, §§ 1–18, 1979 Tex. Gen. Laws 1978, *as recognized in Daitch v. Mid-Am. Apartment Comtys., Inc.*, 250 S.W.3d 191, 195 (Tex. App.—Dallas 2008, no pet.). At common law,

13

*caveat emptor* controlled the landlord-tenant relationship, ensuring that no warranty of habitability was implied upon leasing of the premises. 5 THOMPSON ON REAL PROPERTY § 41.04(a)(1), at 169-70 (David A. Thomas, N. Gregory Smith eds., 2d Thomas ed. 2007); *Yarbrough v. Booher*, 174 S.W.2d 47, 48 (Tex. 1943). Without an implied warranty of habitability or specific lease language to the contrary, a landlord had no obligation during the term of the lease to maintain or repair the premises. 5 THOMPSON ON REAL PROPERTY § 41.04(b), at 172. Rather, it was the tenant's duty to make ordinary repairs. *Halsell v. Scurr*, 297 S.W. 524, 529 (Tex. Civ. App.—Fort Worth 1927, writ dism'd w.o.j.).

Consistent with this notion, leases commonly included a covenant to return possession of the premises in as good a condition as when delivered, excepting wear and tear. *See Miller, Billups & Co. v. Morris, Ragsdale & Simpson*, 55 Tex. 412, 419 (1881); *Howeth v. Anderson*, 25 Tex. 557, 572 (1860); *Publix Theatres Corp. v. Powell*, 71 S.W.2d 237, 238 (Tex. 1934). A covenant of this type required the tenant to use his best efforts to keep the premises in the same state as he found them. *Howeth*, 25 Tex. at 572. In the event of an accidental fire, however, such a covenant did not impose liability on the tenant or require him to rebuild the structures destroyed unless the tenant had expressly agreed "to restore edifices and structures destroyed by casualty, or some other covenant which is equivalent thereto, such as a covenant 'to uphold and repair,' or 'to repair,' . . . ." *Miller, Billups & Co.*, 55 Tex. at 421-22. A covenant that merely required the tenant "to redeliver or restore to the lessor, in the same plight and condition, usual wear and tear excepted" could not fairly or reasonably be construed to impose the burden of accidental casualty loss on the tenant. *Id.* at 422; *Howeth*, 25 Tex. at 573 ("Looking to the terms and subject matter of the contract, we do not think it reasonable or fair to conclude that the parties contemplated that the lessors were to become insurers

14

of the property against those casualties which ordinary prudence and foresight could not have guarded against."). But an express covenant "to uphold and repair" or "to repair" obligated the tenant to make good all losses during the tenancy. *See Miller, Billups & Co.*, 55 Tex. at 422; *Howeth*, 25 Tex. at 573 ("When a tenant is under an *express covenant* to uphold and repair the premises, he is liable to make good all losses, and must even rebuild in case of casualty by fire or otherwise. . . . [I]f he covenants to repair generally, this will impose on him a liability to uphold the buildings, without regard to accidents or the necessary decay of the old materials." (quoting Taylor, L. & T. American Law of Landlord and Tenant § 357)); *Warner v. Hitchins*, 5 Barb. 666, 668 (N.Y. Gen. Term 1849) ("It is . . . settled, that when the lease contains, on the part of the lessee, *an express covenant to uphold and repair* the premises, he is liable to make good such losses [caused by accidental fire]."). Under the common law, therefore, landlord and tenant were free to negotiate the tenant's responsibility for accidental destruction of property by fire.

Though the landlord-tenant relationship had historically centered on possession, over time tenants became increasingly concerned with the condition and habitability of the rented premises. *Kamarath*, 568 S.W.2d at 660. In part, this stemmed from the average residential tenant's inability to make repairs to complex mechanical and electrical components of the modern home. 5 THOMPSON ON REAL PROPERTY § 41.05(a), at 175. Correspondingly, many courts and state legislatures took action to modify the common law, which had traditionally allocated the duty to perform ordinary repairs to the tenant. *Id.* In particular, this Court abrogated Texas common law by finding an implied warranty of habitability in *Kamarath v. Bennett*, 568 S.W.2d at 661. Shortly after *Kamarath* was decided, superseding legislation was enacted that "abrogat[ed] the implied warranty and creat[ed] a limited landlord duty to repair." *Daitch*, 250 S.W.3d at 195.

15

In its current iteration, the Texas Property Code provides:

> The duties of a landlord and the remedies of a tenant under [subchapter B, which governs repairs of a leasehold,] are in lieu of existing common law and other statutory [landlord and tenant duties and remedies]. Otherwise, this subchapter does not affect any other right of a landlord or tenant under contract, statutory law, or common law that is consistent with the purposes of this subchapter . . . . This subchapter does not impose obligations on a landlord or tenant other than those expressly stated in this subchapter.

TEX. PROP. CODE § 92.061. Thus, to the extent the Property Code imposes limitations on contracting in the leasehold-repair context, the Property Code reflects the Legislature's public-policy determinations on the matter. *See Churchill Forge*, 61 S.W.3d at 370 (acknowledging that Chapter 92 of the Texas Property Code limits freedom of landlord and tenant to contract).

### C. Freedom to Shift Repair Obligations is Restricted

The current version of the Property Code deviates in certain respects from common law landlord-tenant duties and remedies, but all rights not inconsistent with the statute remain intact. *See* TEX. PROP. CODE § 92.061. As such, the Property Code imposes no barrier to contract beyond those deriving from its terms. *See Churchill Forge*, 61 S.W.3d at 374 (Property Code's contract restraints are "activated" only when the landlord has a statutory repair duty). To determine whether the contract provision at issue is void as against public policy, we first consider the legislatively imposed restraints on liberty of contract in the landlord-tenant relationship. We begin our discussion with those considerations, because it is up to the Legislature, not the courts, to decide what the policy of this state should be in the landlord-tenant context.

With respect to freedom of contract, the Legislature plainly identified the prohibition it intended to enforce in section 92.006(c):

16

> A landlord's duties and the tenant's remedies under Subchapter B, which covers conditions materially affecting the physical health or safety of the ordinary tenant, may not be waived except as provided in Subsections (d), (e), and (f) of this section.

TEX. PROP. CODE § 92.006(c); *Churchill Forge*, 61 S.W.3d at 371. As the statute articulates, and as we affirmed in *Churchill Forge*, a landlord cannot contractually avoid a repair obligation except when statutorily authorized. The landlord, however, does not have a statutory duty to repair all conditions that may arise in a tenancy.

With regard to habitability, the landlord's limited duty to repair or remedy is addressed in section 92.052 of the Property Code. After receiving proper notice from a tenant in good standing, a landlord must make a diligent effort to repair or remedy only those conditions (1) materially affecting the tenant's physical health or safety or (2) involving proper operation of a water heater. TEX. PROP. CODE § 92.052(a). Even then, the landlord's obligation to make such repairs is not absolute. To the contrary:

> Unless the condition was caused by normal wear and tear, the landlord does not have a duty . . . to repair or remedy a condition caused by:
>
> (1)     the tenant;
> (2)     a lawful occupant in the tenant's dwelling;
> (3)     a member of the tenant's family; or
> (4)     a guest or invitee of the tenant.

*Id.* § 92.052(b). Section 92.052(b) does not include fault-based language, and the causal standard is not specified.

As we explained in *Churchill Forge*, the legislatively imposed restriction on freedom of contract provided in section 92.006(c) is triggered only when the landlord has a duty under section

92.052. *See Churchill Forge*, 61 S.W.3d at 373. When section 92.006(c)'s general prohibition is "activated," the statutory exceptions to the prohibition come into play. *Id*. at 374. The first exception permits delegation of the landlord's repair duty to the tenant but not cost-shifting. TEX. PROP. CODE § 92.006(d) (landlord and tenant may agree for the tenant to repair any condition covered by subchapter B at the landlord's expense); *accord id.* § 92.0561(g) (landlord's repair duty may not be waived except as provided in section 92.006(e)-(f) but parties may agree for the tenant to repair at the landlord's expense). The second permits the shifting of both the duty and cost of repair to the tenant for any type of condition affecting habitability, subject to stated conditions that include specificity and conspicuity requirements. *Id.* § 92.006(e). That exception, however, only applies to landlords who own no more than one rental dwelling at the beginning of the lease term. *Id.* The only statutory exception to nonwaivability that permits cost-shifting and applies to the landlord-tenant relationship in this case is section 92.006(f):

> (f) A landlord and tenant may agree that, except for those conditions caused by the negligence of the landlord, the tenant has the duty to pay for repair of the following conditions that may occur during the lease term or a renewal or extension:
>
>> (1) damage from wastewater stoppages caused by foreign or improper objects in lines that exclusively serve the tenant's dwelling;
>>
>> (2) damage to doors, windows, or screens; and
>>
>> (3) damage from windows or doors left open.
>
> This subsection shall not affect the landlord's duty under Subchapter B [i.e., section 92.052] to repair or remedy, at the landlord's expense, wastewater stoppages or backups caused by deterioration, breakage, roots, ground conditions, faulty construction, or malfunctioning equipment. A landlord and tenant may agree to the provisions of this subsection only if the agreement meets the [clear, specific, and conspicuous writing] requirements of Subdivision (4) of Subsection (e) of this section.

18

*Id.* § 92.006(f). Section 92.006(f) "specifically authorizes the parties to shift by contract costs of repairs for certain damages from the landlord to the tenant irrespective of whether the damage was caused by the tenant." *Churchill Forge*, 61 S.W.3d at 372-73.

The facts of this case do not fall within subsection (f)'s exception to subsection (c)'s anti-waiver rule, and on its face, the catchall language in the Reimbursement Provision is not limited to those conditions. *See id.* § 92.006(c), (f). White thus asserts that the lease, on its face and as applied, is repugnant to the statute because the Reimbursement Provision applies when the landlord has a repair duty and when none of the exceptions to subsection (c) apply.

Philadelphia Indemnity takes a different view, asserting that White failed to carry her burden of establishing the lease agreement conflicts with section 92.006(c) (i.e., that the landlord bears a nonwaivable duty to repair the fire damage) and arguing that the contract would be permitted even if section 92.006(c) applies. As to the latter point, Philadelphia Indemnity reads *Churchill Forge* as countenancing any contractual arrangement not *expressly prohibited* by the Property Code rather than limiting freedom of contract to the *permissive* arrangements authorized in section 92.006(d), (e), and (f). *See Churchill Forge*, 61 S.W.3d at 371 ("Legislative permission to contract under certain circumstances does not necessarily imply that contracting under other circumstances is prohibited. Certainly, given this State's strong commitment to the principle of contractual freedom, we should hesitate to infer a general prohibition from a statutory clause granting specific permission to contract."). Thus, even if 92.006(c) applies, Philadelphia Indemnity contends the statutory exceptions are not exclusive.

19

Philadelphia Indemnity misconstrues the limited holding in *Churchill Forge*, in which we considered a contract provision "not covered by" section 92.006(c)'s waiver prohibition. When section 92.006(c) applies, however, the exceptions are permissive, but they are also exclusive.

In *Churchill Forge*, we considered the public-policy impact of the pertinent Property Code provisions under similar facts, but a materially different contractual arrangement. 61 S.W.3d at 369-70. In that case, an apartment complex had been damaged in a fire allegedly caused by a tenant's negligence or improper use. *Id.* at 369. Based on a reimbursement provision in the rental agreement that was considerably more narrow than the one in White's lease, the landlord sought reimbursement of repair costs from the tenant's mother, who had co-signed the lease. *Id.* at 369-70. Like White's lease, the *Churchill Forge* lease included language expressly requiring the tenant to reimburse the landlord for the damages identified in section 92.006(f) unless the damage or the necessity of repair resulted from the landlord's negligence. *Id.* at 370. But unlike White's lease, the "catchall" language in the tenant's lease imposed liability only for damages caused by the tenant or an affiliated party's improper use or negligence. *Id.* ("You must promptly reimburse us for loss, damage, or cost of repairs or service caused anywhere in the apartment community by your or any guest's or occupant's improper use or negligence."). The primary issue was whether the catchall language in the lease provision was unenforceable by statute or under the common law. *Id.* at 369.

Although acknowledging that section 92.006(c) restricts freedom of contract, we observed that (1) the waiver prohibition applies only if the landlord has a duty or the tenant has a remedy under subchapter B, (2) under section 92.052, landlords have no duty to bear the cost of repairing tenant-caused damages, and (3) under sections 92.056 and 92.0561, the tenant's remedies "are conditioned upon the existence of a duty under Subchapter B." *Id.* at 370-72 (citing sections 92.056(a), (e) and

20

92.0561(d), which condition the tenant's remedies on the landlord's liability for the repair and condition the landlord's liability on the existence of a duty under section 92.052(b)). Because subchapter B "imposes no duty on [the landlord] to bear the cost of repairing damage allegedly caused by [the tenant]," we held that neither section 92.006(c) nor its permissive exceptions "restrict the parties' freedom to contract as they wish concerning [tenant-caused damages]." *See id.* at 371-72 ("[B]ecause under Subchapter B landlords have no duty to repair or pay to repair tenant-caused damage, and tenants have no remedy for such damage, section 92.061 makes clear that the Legislature did not intend the Subchapter to otherwise affect the parties' presumptive right to contract over who would be responsible for conditions caused by the tenant, the tenant's occupant, or guest.").

The lease provision in *Churchill Forge* did not conflict with section 92.006(c) because, consistent with section 92.052(b), the lease expressly limited the tenant's reimbursement obligation to damages caused by or statutorily imputed to the tenant. In fact, the lease provision was more narrowly worded than section 92.052(b) by incorporating a fault-based requirement. Though not deciding whether the tenant was actually negligent, or whether he had actually caused the fire, we determined there was no public-policy bar—either under the Property Code or at common law—to contractually allocating responsibility for repair costs negligently or intentionally caused by the tenant or a cotenant. *Id.* at 370, 373 ("Public policy does not restrict a landlord and tenant from agreeing that the tenant will be responsible for damages the tenant or cotenant causes.").

We discussed the interplay of duty, cause, and contractual risk allocation as follows:

21

> Taken together, [sections 92.006(c) and its exceptions] dictate that a commercial landlord [i.e. one who owns more than one residential rental dwelling] cannot ask a tenant to pay for repairs that the landlord has the duty to make. Excepted from that dictate is subsection (f), under which there are three specific kinds of repairs that the parties can, by contract, shift the duty to pay for from the landlord to the tenant. . . . And not covered by that dictate are those agreements between the parties concerning damages for which the landlord has no duty to repair, i.e., tenant-caused damages.

*Id*. at 373. A contract allocating responsibility for damages negligently or intentionally "caused by" the tenant, the tenant's occupant, or guest thus did no violence to public policy. *Id.* And even though *Churchill Forge* involved a casualty loss, we observed that the Property Code does not distinguish between casualty losses and other conditions in determining whether a landlord has a duty to repair. *Id.*

As *Churchill Forge* instructs, public policy does not prohibit landlords and tenants from agreeing that the tenant will be responsible for tenant-caused or tenant-imputed damages because, in those circumstances, the landlord has no duty to make (or fund) repairs and the tenant has no remedy under Subchapter B. *See* TEX. PROP. CODE §§ 92.052(b), .056(a), (b), (e), .0561(a), (d). When a duty exists, however, it cannot be shifted to the tenant except as specifically authorized by statute. *See id.* § 92.006(c) (no waiver of duties or remedies except under subsections (d), (e), or (f)). When considered in context, isolated language employed in *Churchill Forge* and relied on by Philadelphia Indemnity does not suggest the contrary.

With regard to the Reimbursement Provision in White's lease, broad notions of public policy ultimately reduce to whether enforcement of the reimbursement provision would require White to pay for damages that were not tenant-caused and that the landlord, therefore, had a nonwaivable duty to make. We acknowledge that, on its face, the Reimbursement Provision lends itself to such an

22

application, but mere *potential* for an impermissible application cannot be dispositive of the public-policy inquiry.

### D. The Reimbursement Provision is Not Unenforceable Per Se

"'A contract to do a thing which cannot be performed without violation of the law' violates public policy and is void." *In re Kasschau*, 11 S.W.3d 305, 312 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding) (quoting *Lewis v. Davis*, 199 S.W.2d 146, 148-49 (Tex. 1947)). However, a contract will not be declared void merely because it *could have been* performed illegally or contrary to public policy. *Lewis*, 199 S.W.2d at 149 ("A contract that could have been performed in a legal manner will not be declared void because it may have been performed in an illegal manner.")*; see, e.g.*, *Wade v. Jones*, 526 S.W.2d 160, 163 (Tex. App.—Dallas 1975, no writ). "[P]arties are presumed to know the law, and are likewise presumed to intend that their agreement shall have legal effect." *Tex. Emp'rs Ins. Ass'n v. Tabor*, 283 S.W. 779, 780 (Tex. Comm'n App. 1926, judgm't adopted).

The Reimbursement Provision in White's rental agreement is overly broad in the sense that it does not expressly carve out any exceptions other than landlord negligence and, therefore, is susceptible to overreaching in its application by encompassing reimbursement scenarios in which a landlord would have a nonwaivable duty to repair under chapter 92 of the Property Code. But this circumstance is not fatal to enforcement. The provision would be unenforceable per se only if it could not be performed without violating the Property Code. Here, that is simply not the case. For instance, if White's landlord were seeking reimbursement for remediating a tenant-caused condition or a condition not materially affecting habitability, the cost-shifting limitations in section 92.006(c)-(f) would not be implicated and performance of the contract would not contravene the statute.

23

Appealing as it might seem to automatically invalidate broadly worded contract provisions, doing so necessarily imperils freedom of contract and, in the residential-leasing context, deprives the Legislature of its role as the policy-making body.[8] Rather, such an approach substitutes the policy views of individual judges for those of the Legislature. Tempting as it is for courts to make policies that protect consumers, our role is much more circumscribed. We must interpret the law fairly and defer to the Legislature's policy choices. We thus adopt a more measured approach that harmonizes the importance of contractual liberty with legislatively enacted public-policy limitations. Notwithstanding the Reimbursement Provision's apparent overbreadth, we will not improperly employ public policy to mechanically jettison the parties' agreement. Rather, we must read the agreement in conformity with the limitations imposed in the Property Code and refuse enforcement only when doing so would create an actual conflict with the statute. *Cf. Lewis*, 199 S.W.2d at 149. Consequently, we will decline to enforce the Reimbursement Provision only if the evidence establishes its invalidity in the situation at hand.

---

[8] JUSTICE DEVINE's insistence that the Reimbursement Provision is facially void reflects a fundamental misunderstanding of the distinction between a contract provision unenforceable as written and one that is capable of being enforced as written. *See Lewis v. Davis*, 199 S.W.2d 146, 148-49 (Tex. 1947) ("A contract to do a thing which *cannot be performed without a violation of the law* is void." (quoting *Tex. Emp'rs Ins. Ass'n v. Tabor*, 283 S.W. 779, 780 (Tex. Comm'n App. 1926, judgm't adopted)) (emphasis added)). In the landlord-tenant context, the parties are free to contract as they choose and their agreement will be enforced except to the extent prohibited by law. Importantly, the Legislature has *not* (1) categorically prohibited shifting of repair costs, (2) prohibited tenants from assuming responsibility for repairs that are not caused by the tenant, or (3) prohibited shifting the costs to repair conditions of habitability. Rather, the Legislature has only prohibited contractual shifting of repair costs if both habitability and third-party cause are factually presented. The Reimbursement Provision is not void because it can be lawfully enforced as written; the party seeking to avoid enforcement on illegality or public-policy grounds bears the burden of proving that an exception to enforcement applies. The approach to contract enforcement JUSTICE DEVINE advocates—reflexive voiding of any contract provision that could be performed in conflict with a statute—turns the illegality defense on its head and upsets settled contract expectations. *Cf. Santoro v. Accenture Fed. Servs., LLC*, 748 F.3d 217, 221-23 (4th Cir. 2014) (rejecting argument that arbitration provision was wholly unenforceable because its language encompassed rights and remedies made nonwaivable and nonarbitrable; statute making arbitration agreements for such claims invalid and unenforceable was an exception to enforcement and party opposing arbitration had burden of establishing exception).

### E. The Record Does Not Conclusively Establish Unenforceability

The critical fact that bears on contract invalidity in this case is whether, within section 92.052(b)'s meaning, the fire that originated in chattel owned and operated by White was "caused by" White even though the source of ignition is unknown. *See Churchill Forge*, 61 S.W.3d at 373. With respect to that matter, the parties join issue on the proper construction of section 92.052(b) with regard to the burden of proof and the existence of a fault-based limitation.

We review statutory construction issues de novo, *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011), and our primary objective is to give effect to the Legislature's intent as expressed in the statute's language, *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631-32 (Tex. 2008). We discern legislative intent from the statute as a whole, not from isolated portions. *20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008). Absent an absurd result, we rely on the plain meaning of the text unless a different meaning is supplied by legislative definition or is apparent from the context. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008).

Applying these well-established statutory-construction principles, we hold the causal standard in section 92.052(b) is not fault-based, and White bears the burden of proving facts in avoidance of contract enforcement. Given this statutory construction, we further conclude that White cannot rely on the jury's negative finding to question one—inquiring whether her negligence caused the fire—as a substitute for an affirmative finding that the damages were not tenant caused. White's failure to submit a causation question to the jury is the lynchpin for concluding she has failed to prove her affirmative defense.

25

**1. Burden of Proof**

White carries the burden of pleading and proving the contract's invalidity as an affirmative defense. *See Franklin v. Jackson*, 847 S.W.2d 306, 310 (Tex. App.—El Paso 1992, writ denied) ("The presumption being in favor of legality, the burden of proof is on the party asserting the illegality."); TEX. R. CIV. P. 94 (listing contract-avoidance defenses that are affirmative defenses—failure of consideration, fraud, illegality, and statute of frauds—and extending the affirmative-pleading requirement to "any other matter constituting an avoidance or affirmative defense"). As we recently explained, an affirmative defense "defeats the plaintiff's claim without regard to the truth of the plaintiff's assertions" and places "the burden of proof [] on the defendant to present sufficient evidence to establish the defense and obtain the requisite jury findings." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 156-57 (Tex. 2015). The disputed issue is whether White secured the findings necessary to prove her landlord had a nonwaivable repair duty under the facts of this case.

As we have discussed in some detail, the anti-waiver prescription in section 92.006(c) is "triggered" only if the landlord has a duty to repair or the tenant has a remedy under subchapter B. *Churchill Forge*, 61 S.W.3d at 372-73. The existence of a duty to repair is the key inquiry because, under subchapter B, a landlord's liability and a tenant's repair remedies are conditioned on the existence of a duty under section 92.052. *See* TEX. PROP. CODE §§ 92.056(a) ("A landlord's liability under this section is subject to Section 92.052(b) regarding conditions that are caused by a tenant . . . ."), (e) (providing remedies to a tenant to whom a landlord is liable), .0561(d) (providing tenant repair and deduct remedies "only if . . . [t]he landlord has a duty to repair or remedy the condition under section 92.052" and other requirements are met); *see also Churchill Forge*, 61 S.W.3d at

26

371-72; *cf.* TEX. PROP. CODE § 92.0563(b) (providing a statutory remedy if a landlord knowingly contracts to waive the landlord's duty to repair).

Section 92.052 defines the landlord's duty of diligent repair as follows:

> (a) A landlord shall make a diligent effort to repair or remedy a condition if:
>> (1) the tenant specifies the condition in a notice to the person to whom or to the place where rent is normally paid;
>> (2) the tenant is not delinquent in the payment of rent at the time notice is given; and
>> (3) the condition:
>>> (A) materially affects the physical health or safety of an ordinary tenant; or
>>> (B) arises from the landlord's failure to provide and maintain in good operating condition a device to supply hot water of a minimum temperature of 120 degrees Fahrenheit.
>
> (b) . . . [T]he landlord does not have a duty . . . to repair or remedy a condition caused by:
>> (1) the tenant;
>> (2) a lawful occupant in the tenant's dwelling;
>> (3) a member of the tenant's family; or
>> (4) a guest or invitee of the tenant[]
> [unless the condition was caused by normal wear and tear].
>
> (c) This subchapter does not require the landlord:
>> (1) to furnish utilities from a utility company if as a practical matter the utility lines of the company are not reasonably available; or
>> (2) to furnish security guards.
>
> (d) The tenant's notice under Subsection (a) must be in writing only if the tenant's lease is in writing and requires written notice.[9]

TEX. PROP. CODE § 92.052. Read in isolation, section 92.052 could be construed in two ways, but only one construction is reasonable when the statute is considered as a whole. *See In re Office of the*

---

[9] White's lease requires that all notices and requests be in writing "except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, crime in progress, or fair housing accommodation or modification."

*Att'y Gen. of Tex.*, 456 S.W.3d 153, 155-56 (Tex. 2015) (emphasizing the importance of context in questions of statutory construction).

Construed in context, section 92.052 defines the landlord's duty by both positive and negative references and imposes a repair obligation only if all its elements are satisfied. Such a construction properly places the burden of proof on the party claiming the existence of a duty. *See Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2004) (when one claims a duty owed by another, the party claiming the duty generally bears the burden of establishing it). But more importantly, it places the burden of proof on the party who controls the leased premises and is, therefore, in the best position to (1) avoid damage to the premises and (2) prove that another party is responsible for the damage.

The dissenting justices read section 92.052(a) as defining the landlord's duty and subsection (b) as presenting an exception. ___ S.W.3d at ___ (BOYD, J., dissenting). Under this view, White need only plead and present sufficient evidence of the three elements in subsection (a) to carry her burden of proving an unwaivable repair duty, and the landlord can escape liability only by proving, under subsection (b), that the condition was caused by the tenant. In other words, subsection (a) provides the elements of White's affirmative defense and subsection (b) provides the elements of the landlord's counter defense. A duty/exception construction of section 92.052 presents, on its face, a plausible, natural reading of subsections (a) and (b) and serves the salutary purpose of encouraging prompt remediation of conditions affecting habitability.

But it also poses several practical problems and is inconsistent with the statute as a whole. Among other issues, a duty/exception construction of section 92.052 places the landlord at a distinct disadvantage in attempting to prove the cause of damage to premises under the tenant's control,

creating potentially insurmountable proof problems. The facts of this case, though unusual in the degree of damage, are a prime example.

We need not speculate about which construction the Legislature intended, however, because section 92.053 of the Property Code resolves the issue and plainly charges the tenant with the burden of proving the cause of any premises condition if the landlord's obligation to repair the condition is disputed.

Section 92.053 provides:

(a) *Except as provided by this section*, the tenant has the burden of proof in a judicial action to enforce a right resulting from the landlord's failure to repair or remedy a condition under Section 92.052.

(b) If the landlord does not provide a written explanation for delay in performing a duty to repair or remedy on or before the fifth day after receiving from the tenant a written demand for an explanation, the landlord has the burden of proving that he made a diligent effort to repair and that a reasonable time for repair did not elapse.

*Id.* § 92.053 (emphasis added). A tenant's repair remedies under subchapter B are conditioned on the existence of a duty under section 92.052. In fact, section 92.052's sole function is to provide a basis for the tenant to obtain repairs or a statutory remedy under subchapter B. If the tenant satisfies all the requirements in section 92.052(a) and the landlord does nothing, the tenant has no remedy under subchapter B except on the terms provided. Accordingly, section 92.053(a) necessarily allocates the burden of proof under section 92.052 to the tenant. In doing so, section 92.053 makes no distinctions among section 92.052's various subsections. *Compare id.* § 92.056 ("A landlord's liability [to a tenant for failure to diligently repair] is subject to Section 92.052(b) regarding conditions that are caused by a tenant and Section 92.054 regarding conditions that are insured casualties."). Even so, section 92.053(a) is not inherently inconsistent with burden-shifting under

29

section 92.052, and if section 92.053 were silent about the landlord's burden of proof, it might add nothing to the analysis.

But section 92.053 not only speaks to the tenant's burden, it specifies a discrete and limited circumstance in which the landlord bears the burden of proof. Significantly, section 92.053(b) does not allocate the burden of proof under section 92.052(b) to the landlord. Thus, even if section 92.052's *structure* could support the burden-shifting construction of the statute the dissenting justices favor, section 92.053 provides differently.[10] Taken together, sections 92.052 and 92.053 create a presumption that damage to premises under the tenant's control was caused by the tenant and the tenant must prove otherwise.[11] Absent such proof, the landlord has no duty to repair, and an agreement allocating repair responsibility to the tenant does not contravene section 92.006.

The Legislature has spoken, and we are not empowered to determine what is "fair" legislative policy. Amicus briefs filed in connection with this case raise a number of competing interests and concerns in the landlord-tenant relationship, but the duty to balance opposing interests and equities and to set the policy of the state lies with our duly elected representatives. Our duty is to give effect to the Legislature's collective policy determinations.

---

[10] Language we employed in *Churchill Forge* assumes the opposite but burden of proof was not at issue in that case. *See Churchill Forge*, 61 S.W.3d at 370 (noting that questions of tenant negligence and causation were not presented).

[11] This point is illustrated by a later-enacted provision in the subchapter governing security devices. Though landlords generally have a duty to pay the cost to repair or replace a security device, the tenant can contractually assume responsibility for repairs resulting from misuse or damage by the tenant or an affiliated party. TEX. PROP. CODE § 92.162(a), (b); *see also id.* § 92.006(b). Significantly, "[m]isuse or damage to a security device that occurs during the tenant's occupancy is presumed to be caused by the tenant, a family member, an occupant, or a guest. The tenant has the burden of proving that the misuse of or damage was caused by another party." *Id.* § 92.162(b). Much like the repair duty imposed in section 92.052, inoperable security devices raise tenant-safety concerns, but the obligation to pay for necessary repairs may be contractually delegated if the tenant causes the damage, and the tenant is charged with establishing damage was not tenant caused. We do not cite section 92.162 as support for a particular construction of sections 92.052 and 92.053 but as an equivalent legislative expression regarding the burden of proving the cause of damage to a demised dwelling.

## 2. Essential Fact Findings Are Lacking

White did not meet her burden to obtain the requisite fact findings. The jury failed to find that White's negligence proximately caused the fire, but made no affirmative finding regarding causation. Both White and the court of appeals relied on the jury's negative response to the negligence question as a proxy for establishing the factual predicate to the landlord's repair duty. The court of appeals provided no analysis of the issue, but White asserts that the negligence finding resolves the public-policy matter because "caused by" requires fault and proximate cause. We disagree and conclude that (1) "caused by" is not a fault-based standard, (2) a failure to find response to the negligence question does not equate to an affirmative finding of no causation, and (3) assuming without deciding that proximate cause is the relevant causal standard, the record does not conclusively establish that White's actions did not cause the fire.

Because White bears the burden of proof, the jury's failure to find White's negligence caused the fire is not dispositive of the landlord's duty. A negative answer to the negligence issue simply means that Philadelphia Indemnity failed to carry the burden of proof on its negligence claim; it is not a positive finding that White was not at fault or did not cause the damage. *See, e.g.*, *Battaglia, M.D., P.A. v. Alexander*, 177 S.W.3d 893, 903 (Tex. 2005) ("The jury's failure to find Battaglia negligent was not an affirmative finding that Battaglia was *not* negligent."); *Grenwelge v. Shamrock Reconstructors, Inc.*, 705 S.W.2d 693, 694 (Tex. 1986) (holding that the jury's failure to find breach of contract meant the plaintiffs failed to carry their burden of proof, not that the defendant substantially performed the contract); *Arbor Windsor Court, Ltd. v. Weekley Homes, LP*, 463 S.W.3d 131, 141 (Tex. App.—Houston [14th Dist.] 2015, pet. filed) ("A negative answer to a jury question on 'failed to comply with a contract' is not a positive finding that [the] party 'complied with a

31

contract.'"); *Cullins v. Foster*, 171 S.W.3d 521, 536-37 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("If the jury makes a negative finding in answer to a question, it means the party with the burden of proof has failed to carry its burden."). Characterizing the jury's negative response to question one as an affirmative finding that White did not cause the damage thus misinterprets the jury's finding. *See C. & R. Transp., Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966) (jury's negative finding to special issue regarding truck driver's actions before accident could not be treated as an affirmative finding of the opposite; jury's refusal to find meant only that the party bearing the burden of proving the fact failed to do so); *cf. Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989) (for purposes of determining the proper standard of review, "treat[ing] the jury's *failure to find* that [the defendant] acted with justification or excuse as a finding by the jury that [the defendant] acted *without* justification or excuse . . . is a misinterpretation of both the issue and the answer"). Philadelphia Indemnity had the burden to obtain an affirmative finding on its negligence claim, but the onus was on White to obtain an affirmative finding that the fire-related damages were not "caused by" her to establish her affirmative defense to Philadelphia Indemnity's contract claim.

The jury's finding also does not aid White because fault and causation were commingled, and section 92.052(b) does not employ a fault-based standard. Cause does not inherently connote fault; rather they are distinct inquiries. While the Legislature is free to provide a more expansive meaning of "caused by" for purposes of chapter 92, it did not do so. The absence of fault-based language in section 92.052(b) is further telling when contrasted with other provisions in chapter 92 incorporating such language. *Compare* TEX. PROP. CODE §§ 92.001 (defining "normal wear and tear" as excluding "deterioration that results from negligence, carelessness, accident, or abuse of the premises, equipment, or chattels by the tenant, by a member of the tenant's household, or by a guest or invitee

32

of the tenant"), .006(f) (excluding from permissible contracts those conditions "caused by the negligence of the landlord"), .0131 (landlord liable only if vehicle damage caused by towing service's negligence), and .054 (providing the tenant a remedy if the rental premises are unusable due to a casualty loss totally or partially destroying habitability and "the casualty loss is not caused by the negligence or fault of the tenant"), *with id.* § 92.052(b). "We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). We would have to add words to section 92.052 to give it the meaning White advances. This we cannot do when the statute, construed as a whole, reflects the Legislature's decision to incorporate fault-based standards in some provisions and not others. While fault-based tenant-caused conditions would certainly be excluded from the landlord's statutory repair duty, that is not the exclusive standard.

Having concluded that section 92.052(b) does not employ a fault-based standard, jury question one is further insufficient to satisfy White's burden because (1) there is no way to discern the basis for the jury's finding—a failure to find negligence, proximate cause, or both, and (2) White bore the burden of establishing the cause of the fire. *Cf. Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000). The single broad-form submission was an inadequate vessel to establish both Philadelphia Indemnity's negligence claim and White's conceptually distinct contract-avoidance defense.[12] *See id.*

---

[12] The significance of the jury's failure to find in relation to White's burden of proof involves an abstruse concept. An example employing a less abstract scenario may be helpful in illustrating the point. Consider a situation in which a party bears the burden of proving there is no life on Mars, but the jury question inquires "Do you find by a preponderance of the evidence that there is life on Mars?" The jury's negative finding does not establish the converse—that there is no life on Mars—but merely reflects a failure to carry the burden of persuasion as to the presence

33

Despite the absence of an affirmative finding regarding the cause of the fire, White could establish her affirmative defense if the record conclusively establishes the absence of the requisite causal relationship, either by negating White's role in causing the damage or by establishing an alternative cause of the damage. The record does not do so, however.

At trial, the jury heard evidence that the fire originated in a clothes dryer that was owned by White and under her exclusive control; she was using the dryer at the time the fire started; the dryer was filled with several items; a firefighter testified that some dryer fires are caused by overloading; the dryer manual warned against drying certain materials; a fire department report indicated the possible presence of prohibited materials; White admitted that she had not read the labels on any of the items she put into the dryer and was unaware of any restrictions on drying the items; the dryer's instruction manual warns that cooking oils may cause clothing to catch fire and an expert testified to the presence of vegetable oil residue in samples from the dryer drum; expert witnesses found no evidence of electrical or mechanical malfunction within the dryer, and arson and lint build-up were eliminated as causes; the power cord (which remained intact), the power receptacle, and the circuit breaker were also eliminated as causes; there was no evidence of acts of God or intervention by third parties; and no witness was able to explain how the fire inside the dryer drum started. This is more than some evidence that White's actions, even if not negligent, caused the fire that originated in her

of life on Mars. But even supposing a failure to find could be construed as establishing the obverse, it would not do so if the jury question interconnected two distinct inquiries, such as "Do you find by a preponderance of the evidence there is life *and* water on Mars?" The jury's negative response could be attributed to a failure to persuade as to one element or both. While there may be situations when the evidentiary record conclusively establishes one or the other, absent such circumstances, the party bearing the burden of obtaining an affirmative finding that there is no life on Mars lacks the fact findings necessary to do so.

personal appliance. Accordingly, White has not established that the Reimbursement Provision, as applied, contravenes the limitations set forth in section 92.006.

The dissenting justices lament that applying section 92.053 as it is plainly written places White in the "difficult[]" position of "proving a negative," ___ S.W.3d at ___ (BOYD, J., dissenting), but the issue is more accurately stated as requiring her to prove the fire's cause. To highlight the hardship White purportedly faces in meeting her burden, the dissenting opinions note that a maintenance worker actually connected the dryer for White because her prior attempt failed when the power receptacle sparked and the circuit breaker tripped. *Id.*; *see also* ___ S.W.3d at ___ (DEVINE, J., dissenting). Any disadvantage to White based on these circumstance is not apparent, however, because the role the power cord, power receptacle, and circuit breaker played in causing the fire was susceptible of proof by both parties, and these items were affirmatively eliminated as causes of the fire that originated in the dryer drum.

### III. CONCLUSION

"[C]ompetent parties in Texas 'shall have the utmost liberty of contracting.'" *Churchill Forge*, 61 S.W.2d at 370 (quoting *Wood Motor Co.*, 238 S.W.2d at 185). But when a contractual arrangement is inconsonant with public policy expressed in a regulatory statute, preservation of contractual freedom and its "indispensable partner"—contract enforcement—must yield. *See Woolsey v. Panhandle Ref'g Co.*, 116 S.W.2d 675, 678 (Tex. 1938) ("In line with the universally accepted rule, this court has repeatedly refused to enforce contracts which are either expressly or impliedly prohibited by statutes or by public policy."); *see also Fairfield Ins.*, 246 S.W.3d at 664 (contract enforcement is a necessary corollary to liberty of contracting). While the lease provision is susceptible of an application in contravention of the statute, we must exercise judicial restraint in

holding arm's-length contracts void on public-policy grounds. *Royston, Rayzor, Vickery, & Williams*, 467 S.W.3d at 504. Thus, a contract capable of being performed in harmony with the laws and statutes of this State is not per se void as against public policy. Unless an agreement cannot be performed without violating the law or public policy, the party seeking to avoid enforcement must establish its invalidity under the particular circumstances. White failed to do so in this case.

The Texas Property Code's restrictions on contractually shifting the landlord's repair obligations do not apply if a landlord has no duty to repair in the first instance. Landlords have no obligation to repair premises conditions that are tenant-caused and therefore are not restrained from contracting with tenants for reimbursement of associated repair costs. White failed to obtain a finding that she did not cause the damages at issue; the jury's failure to find in response to a negligence submission is not a substitute for the essential fact finding; and the record does not conclusively establish that fact. Accordingly, White failed to establish the factual predicate to contractual invalidity in this case. We therefore reverse the court of appeals' judgment to the extent it invalidates the Reimbursement Provision on public-policy grounds and render judgment that the lease provision is not unenforceable on that basis. We affirm the court of appeals' judgment on ambiguity, but we remand the case to that court for consideration of White's remaining defenses to enforcement.

_____
Eva M. Guzman
Justice

**Opinion delivered:** May 13, 2016

36