# Supreme Court of Texas

---

No. 24-0864

---

City of San Antonio,

*Petitioner*,

v.

Nadine Realme,

*Respondent*

---

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

---

**Argued November 5, 2025**

JUSTICE HAWKINS delivered the opinion of the Court.

Nadine Realme tripped and suffered an injury in a San Antonio park while participating in a community Thanksgiving "fun run" known as a turkey trot. She sued the City, claiming its negligent maintenance of the park caused her injury. But according to Texas's Recreational Use Statute, TEX. CIV. PRAC. & REM. CODE § 75.002(f), the City is not liable for ordinary negligence when a person "engages in recreation" on government property. Is a holiday-themed community footrace

"recreation"? We hold that it is, and we reverse the contrary decision below.

## I

In the late 19th century, a local YMCA chapter in Buffalo, New York, pioneered the now ubiquitous Thanksgiving community event known today as a turkey trot.[1] This American holiday tradition sees participants young and old, fit and slovenly, slim and stout gathering in their communities to traverse a fixed distance at speeds ranging from a casual stroll to a frenzied sprint. As the San Antonio Food Bank describes it, the turkey trot is "a Thanksgiving tradition rooted in gratitude, unity, and giving back" marked "by the energy of thousands coming together." SAN ANTONIO FOOD BANK, *San Antonio Food Bank Turkey Trot 5K*, https://safoodbank.org/turkeytrot/. The turkey trot fosters civic engagement, builds social cohesion, and honors President George Washington's entreaty that the Thanksgiving holiday serve as a time for Americans to "all unite." George Washington, Thanksgiving Proclamation, 3 October 1789, *reprinted by* NAT'L ARCHIVES: FOUNDERS ONLINE, https://founders.archives.gov/documents/Washington/05-04-02-0091.

---

[1] *See* YMCA BUFFALO NIAGARA, *YMCA Turkey Trot History*, https://www.ymcabn.org/ymca-turkey-trot/history; Michelle Kearns, *The History of the Buffalo Turkey Trot: America's Oldest Footrace*, VISIT BUFFALO (Nov. 27, 2024), https://visitbuffalo.com/the-history-of-the-buffalo-turkey-trot-americas-oldest-footrace/; Matthew Biddle, *121 Years of the YMCA Turkey Trot*, WESTERN NEW YORK HERITAGE (Nov. 21, 2016), https://www.wnyheritage.org/content/121_years_of_the_ymca_turkey_trot/index.html.

Nadine Realme joined the November 2014 Turkey Trot 5K in San Antonio to "have fun" while enjoying the City's "beautiful" and "gorgeous" scenery. But things did not go as she hoped. While following the course through a public park, she tripped over a metal pole fragment, fell, and broke her arm.

Realme sued the City for negligence and gross negligence. Relevant here, the City argued that Realme's negligence claim was barred as a matter of law by the Recreational Use Statute, set out in Chapter 75 of the Civil Practice and Remedies Code. The City argued that it gave Realme permission to use its park for "recreation," thereby immunizing itself from ordinary negligence claims. *See* TEX. CIV. PRAC. & REM. CODE §§ 75.001(3), .002(f). The City observed that the Recreational Use Statute includes a nonexhaustive list of examples of "recreation," and while a holiday fun run is not one of those examples, it nevertheless falls under a statutory "catch-all" provision as an "activity associated with enjoying nature or the outdoors." *Id.* § 75.001(3)(L). Realme disagreed, arguing that she was not engaged in "recreation" because she paid an entry fee for the race "in order to access the premises and engage in the activity that member [sic] of the general public could not engage in" and that walking, jogging, and running are not "recreation" as the statute uses that term.

The trial court sided with Realme, and the court of appeals affirmed. 716 S.W.3d 818, 821 (Tex. App.—San Antonio 2024). Although the court of appeals acknowledged that "participating in an organized footrace is recreation as that term is commonly defined," *id.* at 826, it set aside that ordinary meaning and held that the Recreational Use

3

Statute requires activities to be "associated with enjoying [nature or] the outdoors," *id.* (alteration in original) (quoting *City of Bellmead v. Torres*, 89 S.W.3d 611, 615 (Tex. 2002)). From there, it reasoned that an organized footrace "is a 'celebration of organized human activity,' not an escape into nature." *Id.* at 827 (quoting *Univ. of Tex. at Arlington v. Williams*, 459 S.W.3d 48, 54 (Tex. 2015) (plurality op.)). The "focus" of the activity, it claimed, is "to move through that setting as quickly as possible to reach the finish line," a goal that is "antithetical" to immersing oneself in the surroundings of nature. *Id.* As such, including organized footraces within the statutory definition of recreation would be "inconsistent with the plain language" of the statute. *Id.*

The court of appeals rejected the City's argument (framed as an application of the *ejusdem generis* interpretive canon) that a fun run counts as "recreation" because it is sufficiently similar to the statute's enumerated activities—specifically, swimming, hiking, cycling, and dog-walking. *Id.* at 828. The court reasoned: "The only commonality between the statutorily enumerated activities upon which the City relies and the 5K race in which Realme was participating at the time of her injury is that they all involve people moving through an outdoor space." *Id.* The court noted the addition of dog-walking to the statute occurred after the addition of Subsection (L), indicating the Legislature's belief that dog-walking, and "by extension, outdoor walking in general," was not already subsumed by Subsection (L). *Id.*

Finally, the court of appeals noted that Realme's stated purpose for participating in the race was "to eat turkey and have pies and drink wine and have fun and eat without worr[ying] about calories" and to

4

capture "a social media picture of [herself] with a medal." *Id.* at 829 (alterations in original). This evidence, it held, "defeats the City's position that it conclusively established that Realme entered the premises to enjoy nature or the outdoors." *Id.*

We granted the City's petition for review to resolve persistent confusion among the lower courts as to the proper application of the Recreational Use Statute.

## II

### A

Concerned about a lack of available venues to accommodate Americans' growing appetite for recreation, in 1965 the Council of State Governments promulgated a model statute States could adopt to limit liability for landowners who open their land for recreational activities. *See* The Council of State Governments, *Public Recreation on Private Lands: Limitations on Liability*, 24 SUGGESTED STATE LEGIS. 150, 150 (1965). At the time, less than a third of States had enacted some kind of recreational-use legislation. *Id.* The Council noted the "growing awareness of the need for additional recreational areas to serve the general public" and suggested "that every reasonable encouragement should be given to" those who offer their land for that purpose—by, for example, relieving them of the burden of making the land safe. *Id.*[2]

---

[2] For more on the original policy considerations animating recreational-use statutes, *see generally* Outdoor Recreation Resources Review Act, Pub. L. No. 85-470, §§ 1, 6, 72 Stat. 238 (1958); OUTDOOR RECREATION RES. REV. COMM'N, OUTDOOR RECREATION FOR AM.: A REPORT TO THE PRESIDENT AND TO THE CONGRESS BY THE OUTDOOR RECREATION RESOURCES REVIEW COMMISSION (1962).

Texas adopted its version of the Recreational Use Statute soon after. The original version provided protection only to landowners who opened their land "for purposes of hunting, fishing and/or camping." Act of May 29, 1965, 59th Leg., R.S., ch. 677, § 1, 1965 Tex. Gen. Laws 1551, 1551-52. But in 1981, the Legislature expanded the statute's scope to offer protection when a landowner "gives permission to another to enter the premises for recreational purposes." Act of May 30, 1981, 67th Leg., R.S., ch. 349, § 1, 1981 Tex. Gen. Laws 934, 934. It defined "recreational purposes" through reference to a nonexhaustive list of examples: "activities such as hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing and water sports." *Id.* § 2. When the statute was codified at Chapter 75 of the Civil Practice and Remedies Code in 1985, "recreational purposes" was changed to simply "recreation," although the enumerated activities remained the same. Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, sec. 75.001(2), 1985 Tex. Gen. Laws 3242, 3299.

In the subsequent decades, the statute underwent much tinkering. In 1989, the Legislature added "cave exploration" to the examples. Act of May 15, 1989, 71st Leg., R.S., ch. 736, § 1, 1989 Tex. Gen. Laws 3299, 3299. In 1995, in response to our decision in *City of Dallas v. Mitchell*, 870 S.W.2d 21, 23 (Tex. 1994), the Legislature expanded the statute to reach governmental units. Act of May 26, 1995, 74th Leg., R.S., ch. 520, §§ 1-4, 1995 Tex. Gen. Laws 3276, 3276. In 1997, the Legislature expanded the examples list once again, this time adding "bird-watching" and the catch-all provision "any other activity associated with enjoying nature or the outdoors." Act of Apr. 24, 1997,

75th Leg., R.S., ch. 56, § 1, 1997 Tex. Gen. Laws 123, 124. And in 2005, the list grew again to include "off-road motorcycling and off-road automobile driving and the use of all-terrain vehicles," "bicycling and mountain biking," "disc golf," and "on-leash and off-leash walking of dogs." Act of May 10, 2005, 79th Leg., R.S., ch. 116, § 1, 2005 Tex. Gen. Laws 216, 216. Two years later, the example of "radio control flying and related activities" was added. Act of May 23, 2007, 80th Leg., R.S., ch. 659, § 1, 2007 Tex. Gen. Laws 1235, 1235.

In 2015, "recreational off-highway vehicles" was added to the "pleasure driving" example. Act of May 27, 2015, 84th Leg., R.S., ch. 1071, § 1, 2015 Tex. Gen. Laws 3705, 3705. And most recently, in 2019, the Legislature tacked on "rock climbing," removed "all-terrain vehicles," and amended "recreational off-highway vehicles" to simply "off-highway vehicles." Act of May 22, 2019, 86th Leg., R.S., ch. 740, § 1, 2019 Tex. Gen. Laws 2052, 2052; Act of May 24, 2019, 86th Leg., R.S., ch. 1233, § 2, 2019 Tex. Gen. Laws 3557, 3557-58.

That brings us to the present. As it stands today, the Recreational Use Statute provides, in relevant part:

> [I]f a person enters premises owned, operated, or maintained by a governmental unit and engages in recreation on those premises, the governmental unit does not owe to the person a greater degree of care than is owed to a trespasser on the premises.

TEX. CIV. PRAC. & REM. CODE § 75.002(f).

The "Definitions" section further provides:

"Recreation" means an activity such as:

(A) hunting;
(B) fishing;

7

(C) swimming;
(D) boating;
(E) camping;
(F) picnicking;
(G) hiking;
(H) pleasure driving, including off-road motorcycling and off-road automobile driving and the use of off-highway vehicles;
(I) nature study, including bird-watching;
(J) cave exploration;
(K) waterskiing and other water sports;
(L) any other activity associated with enjoying nature or the outdoors;
(M) bicycling and mountain biking;
(N) disc golf;
(O) on-leash and off-leash walking of dogs;
(P) radio control flying and related activities; or
(Q) rock climbing.

*Id.* § 75.001(3).[3]

**B**

Our Court did not have occasion to interpret the statutory term "recreation" until our 2002 decision in *Torres*. The plaintiff there had been injured while swinging on a playground in a city-owned park. *Torres*, 89 S.W.3d at 612. The Court held that swinging was "recreation" because it is "certainly within the type of activity 'associated with enjoying . . . the outdoors.'" *Id.* at 615 (quoting TEX. CIV. PRAC. & REM. CODE § 75.001(3)(L)). One Justice dissented, arguing that swinging was not "encompassed within the plain language of the Legislature's nonexhaustive list." *Id.* at 617 (Hankinson, J., dissenting). Swinging, the dissent argued, was unlike any of the enumerated activities, and it

---

[3] Realme's injury occurred in 2014. The statute's post-2014 modifications do not materially impact this case.

8

therefore saw no "legislative intent to include sports facilities and playgrounds." *Id.* at 618.

We next grappled with the term "recreation" in 2015. *Williams* presented the question of whether spectating at a high-school soccer game inside a stadium counted as "recreation." 459 S.W.3d at 49. We answered "no," but our fractured Court could not form a majority opinion. The plurality noted that the statute's use of the term "recreation" was "more specific than the word's ordinary meaning" and that the ordinary meaning "would unquestionably include competitive team sports and spectators within its scope." *Id.* at 52. But the plurality would have adopted a restrictive view of the "such as" clause, viewing it as a limiting device rather than a mere nonexhaustive list of examples. The plurality focused heavily on Subsection (L), relying on the dictionary definitions of "nature" and "outdoors" to hold that the statute encompassed only activities in which one "remove[s] oneself from human habitation," not ones that are a "celebration of organized human activity." *Id.* at 54. And because enjoyment of nature or the outdoors was not "integral" to spectating at a sports competition, such activity did not fall within the purview of the Recreational Use Statute. *Id.* at 55.

A two-Justice concurrence in the judgment would have held that the relevant activity in determining whether the statute applied was not spectating but "acquiring and signing a release form" for the plaintiff's child. *Id.* at 58 (Guzman, J., concurring). Another Justice, concurring in the judgment, would have construed the statute narrowly because it deprives the plaintiff of a common-law right and "appl[ied] it only to cases that are '*clearly* within its purview.'" *Id.* at 62 (Boyd, J.,

9

concurring) (quoting *Satterfield v. Satterfield*, 448 S.W.2d 456, 459 (Tex. 1969)). The dissenting Justices would have held that competitive sports fall under the statutory definition of "recreation" because "nothing in the statute demonstrates legislative intent to single out and exclude competitive sports from its reach." *Id.* at 65 (Johnson, J., concurring in part and dissenting in part).

A few months after we decided *Williams*, we confronted the "materially indistinguishable" *Lawson v. City of Diboll*, 472 S.W.3d 667, 668 (Tex. 2015), another case involving an injured spectator. We held that the spectator at a softball game was not engaged in recreation at the time of injury. *Id.* at 669.

Next came *University of Texas v. Garner*, 595 S.W.3d 645 (Tex. 2019), until today our most recent effort to analyze "recreation." There, we held that the Recreational Use Statute applied when the plaintiff entered a university-owned apartment complex "and engage[d] in recreation on those premises." *Id.* at 650 (quoting TEX. CIV. PRAC. & REM. CODE § 75.002(f)). We added that the plaintiff's "subjective intent does not control." *Id.* at 650 n.4. Instead, whether an activity is recreation involves an objective inquiry, and the fact that a plaintiff's idiosyncrasies might make some particular task enjoyable does not necessarily make it "recreation."

As these cases illustrate, Members of our Court have endorsed varying and even conflicting approaches to construing the statutory term "recreation." So it is perhaps unsurprising that lower courts have

10

struggled not only to decide what activities count, but also how to analyze that question.[4]

## III

The Recreational Use Statute forecloses a City's ordinary negligence liability if "a person . . . engages in recreation" on City property. TEX. CIV. PRAC. & REM. CODE § 75.002(f). We first identify the principles of statutory interpretation that guide our analysis. We then apply those principles to conclude that a community fun run is recreation. Finally, we diagnose the analytical errors that have led the lower courts astray.

---

[4] *See, e.g.*, 716 S.W.3d at 827; *Lubbock Cnty. Water Control & Improvement Dist. No. 1 v. Rodriguez*, No. 07-23-00424-CV, 2024 WL 2949042, at *3 (Tex. App.—Amarillo June 11, 2024, pet. dism'd) (holding that watching fireworks was not recreation because it was not like "physical, hands-on activities usually enjoyed outdoors"); *City of Madisonville v. Hernandez*, No. 10-22-00151-CV, 2022 WL 17489755, at *8 (Tex. App.—Waco Dec. 7, 2022, pet. denied) ("We do not believe that flying an aircraft focuses on an 'appreciation of the natural world' in the same way as hunting, fishing, swimming, boating, and camping." (quoting *Lawson*, 472 S.W.3d at 669)); *Univ. of Tex. Health Sci. Ctr. at Hou. v. Garcia*, 346 S.W.3d 220, 226 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (concluding that playing sand volleyball on an outdoor court was recreation under the statute because it is the "type of activity 'associated with enjoying . . . the outdoors'" (quoting *Torres*, 89 S.W.3d at 615)); *Sullivan v. City of Fort Worth*, No. 02-10-00223-CV, 2011 WL 1902018, at *7 (Tex. App.—Fort Worth May 19, 2011, pet. denied) ("We believe there has to be . . . an activeness, a physical exertion, or immersion in the physical elements of nature—that is essential to finding an activity 'associated with enjoying nature or the outdoors' as the statute intends." (quoting TEX. CIV. PRAC. & REM. CODE § 75.001(3)(L))); *Sam Houston State Univ. v. Anderson*, No. 10-07-00403-CV, 2008 WL 4901233, at *3 (Tex. App.—Waco Nov. 12, 2008, no pet.) ("Anderson's sitting on bleachers at an outdoor baseball stadium and watching baseball is within the type of activity 'associated with enjoying . . . the outdoors' and is a form of recreation under section 75.001(3)(L)."), *abrogated by Williams*, 459 S.W.3d at 48.

**A**

"Statutory construction is a question of law for the court to decide." *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002) (citing *Havlen v. McDougall*, 22 S.W.3d 343, 345 (Tex. 2000), and *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex. 1989)). We begin, as always, with the text of the statute. *See Pecos Cnty. Appraisal Dist. v. Iraan-Sheffield Indep. Sch. Dist.*, 672 S.W.3d 401, 408 (Tex. 2023).

"When construing a statute, our primary objective is to determine the Legislature's intent which, when possible, we discern from the plain meaning of the words chosen." *In re Est. of Nash*, 220 S.W.3d 914, 917 (Tex. 2007); *see Brown v. City of Houston*, 660 S.W.3d 739, 752 (Tex. 2023). Plain text, of course, is the "truest manifestation" of legislative intent. *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 642 S.W.3d 551, 557 (Tex. 2022) (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006)). In applying plain meaning, we do not "second-guess the policy choices that inform our statutes or . . . weigh the effectiveness of their results." *McIntyre v. Ramirez*, 109 S.W.3d 741, 748 (Tex. 2003).

"When the text unambiguously answers a question, our inquiry ends," *Brown*, 660 S.W.3d at 752, and we must honor its plain language. After all, when faced with unambiguous language, the "judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)). In many cases, we do not need to deploy advanced interpretive tools because "[w]hen a statute's language is clear and unambiguous, it is

12

inappropriate to resort to rules of construction or extrinsic aids to construe the language." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex. 2008). Canons of construction are unnecessary to construe a clear statute; "only if we cannot discern legislative intent in the language of the statute itself do we resort to canons of construction or other aids." *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 639 (Tex. 2010).

But when the text is fairly capable of multiple meanings, and it is not clear from context which governs, we may look to various secondary canons of construction. While canons of construction "can aid interpretation," *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 84 (Tex. 2017), we emphasize that they "are no more than rules of thumb that help courts determine the meaning of legislation," *Germain*, 503 U.S. at 253. Courts should never apply canons to contort statutory language or achieve absurd results divorced from common sense. *See Mid-Century Ins. Co. of Tex. v. Kidd*, 997 S.W.2d 265, 274 (Tex. 1999). When courts resort to canons, they "must be applied with judgment and discretion, and with careful regard to context." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 176 (2012).

One such canon—often invoked when interpreting the Recreational Use Statute—is the "ancient interpretive principle" known as *ejusdem generis. Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 218 (2024). This canon provides that "where in a statute general words follow a designation of particular subjects or classes of persons the meaning of the general words will be restricted by the particular

13

designation in such statute." *Farmers' & Mechs.' Nat'l Bank v. Hanks*, 137 S.W. 1120, 1124 (Tex. 1911). As we have long observed, "the principle of *ejusdem generis* warns against expansive interpretations of broad language that immediately follows narrow and specific terms, and counsels us to construe the broad in light of the narrow." *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010). When faced with a list of specific items and a catch-all provision, courts should "[c]onsider the listed elements, as well as the broad term at the end, and ask what category would come into the reasonable person's mind." READING LAW at 208; *see Harrington*, 603 U.S. at 217-18.

Regrettably, the canon of *ejusdem generis* "has sometimes been applied with a rigidity that hampered rather than helped the search for genuine textual meaning." READING LAW at 211-12. When used correctly, *ejusdem generis* can help courts understand unclear statutes; when misused, it distorts the law and produces results inconsistent with legislative intent. For this reason, courts should recognize that there are simply times when "the canon does not apply"—including, for example, when "the specifics do not fit into any kind of definable category." *Id.* at 209.

**B**

Applying those principles, we turn to whether a community fun run is "recreation."

**1**

We begin with the statute's "Definitions" section, which includes an entry for "recreation." That provision defines "recreation" only by reference to examples. *See* TEX. CIV. PRAC. & REM. CODE § 75.001(3);

14

*supra* Part II.A. Seventeen enumerated points follow, capturing at least two dozen activities. The phrase "such as" is a clear indication that the list is nonexhaustive. *See Odyssey 2020 Acad., Inc. v. Galveston Cent. Appraisal Dist.*, 624 S.W.3d 535, 547 (Tex. 2021); *see also Williams*, 459 S.W.3d at 64 (Johnson, J., concurring in part and dissenting in part) ("The recreational use statute specifies that the term 'recreation' means activities 'such as' those it lists, clearly indicating legislative intent that the list is non-exclusive."). This nonexclusivity is underscored by the definition's "catch-all" provision. Under Subsection (L), "any other activity associated with enjoying nature or the outdoors" qualifies as recreation. TEX. CIV. PRAC. & REM. CODE § 75.001(3)(L).

We have recognized as a general matter that when "a statute defines a term, a court is bound to construe that term by its statutory definition only." *Needham*, 82 S.W.3d at 318 (citing TEX. GOV'T CODE § 311.011(b)). But we have grounded that observation in the Code Construction Act, which provides: "Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." TEX. GOV'T CODE § 311.011(b). The Recreational Use Statute's list of unremarkable examples does not bestow on the term "recreation" "a technical or particular meaning" that requires us to disregard (much less depart from) ordinary meaning. We have emphasized previously that "[e]ven when a statute provides its own definition or explanation of a term . . . we should not ignore altogether the common meaning of the words being defined, unless the statutory text compels otherwise." *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 135

15

(Tex. 2019). That is, "[c]ourts should not consider the meaning of the term to be defined in total isolation from its common usage." *In re Ford Motor Co.*, 442 S.W.3d 265, 271 (Tex. 2014). "Statutory definitions," we have long held, "must be interpreted in light of the ordinary meaning of the word being defined." *Id.*

Our approach in *Creative Oil* is instructive. There, we interpreted the statutory term "matter of public concern" as it appears in the Texas Citizens Participation Act. *Creative Oil*, 591 S.W.3d at 131. The statute defines "matter of public concern" solely by reference to examples. *Id.*; *see* TEX. CIV. PRAC. & REM. CODE § 27.001(7). We expressly rejected an approach to the statute that would "ignore" the "common meaning" of "matter of public concern," and we refused to consider the list of examples in "isolation" from "common usage." *Creative Oil*, 591 S.W.3d at 135. That is because "[t]he words following 'includes' are illustrative of what is meant by 'matter of public concern,' but they do not purport to supply a comprehensive definition of that phrase." *Id.* at 134; *see also City of Conroe v. San Jacinto River Auth.*, 602 S.W.3d 444, 453 (Tex. 2020) (noting that a list of examples "does shed light" on statutory terms).

The same is true here. The Recreational Use Statute defines "recreation" solely by reference to examples. Consistent with *Creative Oil*, we must consider the "common meaning" of "recreation," informed but not artificially constrained by the "illustrative" examples. *See* 591 S.W.3d at 134-35. The examples "shed light," *City of Conroe*, 602 S.W.3d at 453, and "remove . . . doubt" as to the statutory scope, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008). They serve as a type of

16

error-check, ensuring we give "recreation" a meaning neither unduly broad nor narrow. *See Harrington*, 603 U.S. at 217 ("[W]hen a statute sets out a list discussing 'cars, trucks, motorcycles, or any other vehicles,' we appreciate that the catchall phrase may reach similar landbound vehicles (perhaps including buses and camper vans), but it does not reach dissimilar 'vehicles' (such as airplanes and submarines).").

Turning to common meaning, one authoritative dictionary instructs that in this context, "recreation" means "a mode or means of getting diversion or refreshment." *Recreation*, WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY (1956). It is "diversion" or "play," as distinct from "toil." *Id.*; *see Recreation*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (similar); *Recreate*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("to renew or enliven (as the spirits) through the influence of pleasant surroundings; . . . to refresh after wearying toil or anxiety usu[ally] by change or diversion"). Other dictionaries concur. *See Recreate*, THE OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("[t]o refresh or enliven (the mind, the spirits, a person) by some pastime, amusement, occupation, aggregable news, etc."); *Recreation*, THE OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("a pleasurable exercise or employment"). These dictionary definitions encompass "any form of play, amusement, or relaxation used for" refreshment of body or mind, such as "games, sports, hobbies, reading, walking, etc." *Recreation*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY (1960); *see Recreation*, THE RANDOM HOUSE DICTIONARY OF

17

THE ENGLISH LANGUAGE (2d ed. 1987) ("a pastime, diversion, exercise, or other resource affording relaxation and enjoyment").

The dictionaries' emphasis on "diversion" and "play," as distinct from "toil," comports with the statutory examples. Each listed activity is a form of "diversion" or "play" performed for the sake of its own enjoyment or amusement. A holistic approach grounded in ordinary meaning therefore compels the conclusion that the statute captures other such diversions and forms of play, undertaken for refreshment from the toils of life. That conclusion treats the statutory examples as just that: examples. The Recreational Use Statute's definitions section does not require courts to blind themselves to ordinary meaning and perform the inherently impossible task of deciding whether a given activity is sufficiently similar to, say, disc golf. *Cf. PGA Tour, Inc. v. Martin*, 532 U.S. 661, 700-01 (2001) (Scalia, J., dissenting) (noting it is "impossible" for courts to reliably pronounce the essential features of an activity performed for amusement). Rather, it compels courts to apply ordinary meaning.[5]

---

[5] We stand in good company in concluding that the statutory examples are simply illustrations. As noted, many other states adopted some form of the model recreational-use statute first proposed in the 1960s. Courts across our nation have subsequently adopted the analytical approach we endorse today. As our colleagues in California noted three decades ago, "the list of examples" in California's analogous recreational-use statute "does not effectively limit the meaning of 'recreational purpose.'" *Ornelas v. Randolph*, 847 P.2d 560, 564 (Cal. 1993). Other courts agree. *See, e.g.*, *Hegg v. United States*, 817 F.2d 1328, 1330 (8th Cir. 1987) (agreeing with the lower court's reasoning "that the list of activities expressly mentioned [in Iowa's recreational-use statute] as within the statutory definition of 'recreational purpose' was intended to be illustrative only, not complete and exclusive"); *Schneider v. U.S.A., Acadia Nat'l Park*, 760 F.2d 366, 368 (1st Cir. 1985) ("[T]he list [in Maine's recreational-use statute]

**2**

A community fun run is plainly a recreational activity. Its devotees participate for enjoyment, frivolity, and amusement. They seek diversion in an activity performed for its own sake to bring communities together in celebration. The San Antonio Turkey Trot, with its tradition of elaborate costumes and family-focused dynamic, is by nature playful—the whole point is to do something fun in the community on Thanksgiving. This whimsical, holiday-themed event is geared towards everyone regardless of athletic talent or fitness. It bears the hallmarks of recreation. Nothing in the illustrative list suggests that the Legislature intended a narrower scope that would exclude a community fun run. We therefore conclude that the Turkey Trot easily falls within the Recreational Use Statute.

We emphasize that we reach this holding without any need to shoehorn this particular activity into one of the statute's illustrative examples. We need not specify which features of fun runs align with the elements of disc golf and rock climbing. Likewise, we need not decide whether a community fun run is "any other activity associated with

---

does not purport to be complete, but is only illustrative."); *Kelly v. Hochberg*, 243 P.3d 62, 66 (Or. 2010) ("As a reading of [Oregon's recreational-use] statute demonstrates, it does not actually *define* the term 'recreational purposes,' but, rather, it illustrates what the term means by providing an open-ended list of 'outdoor activities' that are 'included' within the term 'recreational purposes.'"); *cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) ("[T]he definition [in a Department of Labor regulation] is introduced with the verb 'includes' instead of 'means.' This word choice is significant because it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive."); *Warren v. White*, 76 F.2d 764, 765 (5th Cir. 1935) ("[I]t is well settled that those things enumerated are merely by way of illustration, and are in no sense exclusive.").

enjoying nature or the outdoors," as the Subsection (L) catch-all puts it. Overly granular inquiries into whether a particular activity sufficiently relates to "the outdoors" misunderstand the statute and lead courts astray, as we explain in more detail below.

Because Realme entered the City's park and engaged in "recreation," her ordinary negligence claim fails as a matter of law. *See* TEX. CIV. PRAC. & REM. CODE § 75.002(f).

## C

We conclude our discussion by diagnosing the court of appeals' primary analytical missteps.

The heart of the error below lies in the court of appeals' conclusion that an activity cannot be "recreation" unless it can be fairly characterized as one of the enumerated activities. The court embarked on an extended analysis of abstract questions about whether fun runs are "sufficiently connected to enjoyment of the natural world." 716 S.W.3d at 827. For all the reasons explained above, we reject that approach. The *ejusdem generis* canon does not require courts to chart "cave exploration," "waterskiing," "disc golf," "radio control flying," and the rest of the enumerated list on a scatterplot, determine a single line of best fit, place the Turkey Trot on the scatterplot, and measure its distance from the fit line. *See* READING LAW at 211-12 (warning against applying the canon of *ejusdem generis* rigidly so that it "hamper[s] rather than help[s] the search for genuine textual meaning"). Our approach should be holistic, especially where, as here, the Legislature frequently tacks on new and seemingly unrelated items to the ever-growing list of statutory examples.

20

We further reject the court of appeals' suggestion that our approach offends the surplusage canon. *Cf.* 716 S.W.3d at 828 (suggesting our approach "nullifies [the] Legislature's decision to enumerate activities"). It is of course generally true that when construing a statute, we "giv[e] effect to each provision so that none is rendered meaningless or mere surplusage." *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016). But our approach does not impermissibly render the statutory examples surplusage. As "[w]e have repeatedly recognized, when faced with legal language that appears repetitive or otherwise unnecessary, . . . drafters often include redundant language to illustrate or emphasize their intent." *Ohio Cas. Ins. Co. v. Patterson-UTI Energy, Inc.*, 703 S.W.3d 790, 796 (Tex. 2024) (first alteration in original) (quoting *Whole Woman's Health v. Jackson*, 642 S.W.3d 569, 582 (Tex. 2022)). That is, "redundancies may be used for clarity, emphasis, or both." *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 477 (Tex. 2016). And they often reflect a legislature's "ill-conceived but lamentably common belt-and-suspenders approach." READING LAW 176-77. For this reason, "a court may well prefer ordinary meaning to an unusual meaning that will avoid surplusage." *Id.* at 176. That some of the statutory examples may be unnecessary or redundant in light of the ordinary meaning of "recreation" does not require us to abandon that ordinary meaning.

Finally, we note that many of the considerations apparently animating the decision below—including the existence of an entry fee, the "organized" nature of the event, the speed of the runners—do not control. *Cf.* 716 S.W.3d at 826-28. Many recreational activities

21

(including those on the list of examples) require expenditure of resources, including entry fees. Many more involve some organization; a recreational activity does not shed its recreational nature merely because it is performed in a group according to a schedule. And a granular analysis of the speed of a fun run exemplifies the overly myopic parsing our opinion today disavows.

**IV**

Because the Recreational Use Statute immunizes the City to Realme's ordinary negligence claim, she can prevail only by showing gross negligence. *See* TEX. CIV. PRAC. & REM. CODE § 75.002(f); *Garner*, 595 S.W.3d at 647 ("[T]he governmental unit owes [a] person [engaged in recreation] only . . . the duty not to injure intentionally or through gross negligence."). The court of appeals expressly declined to consider Realme's gross-negligence claim. 716 S.W.3d at 830 (citing TEX. R. APP. P. 47.1).

The City now asks us to hold in the first instance that Realme's gross-negligence claim fails as a matter of law. *See* TEX. R. APP. P. 53.4. There may well be sound prudential reasons to do so as there is little sense in needlessly prolonging litigation of a claim destined to fail. Nevertheless, it bears repeating: We are a court of review, not of first view. *1 Coventry Ct., LLC v. Downs of Hillcrest Residential Ass'n, Inc.*, ___ S.W.3d ___, ___, 2026 WL 70832, at *3 (Tex. 2026). Where, as here, the court of appeals has declined to consider an issue, this Court typically declines to do so in the first instance. Mindful that "the law is typically better served when the lower courts review a legal issue before this Court does," *Rattray v. City of Brownsville*, 662 S.W.3d 860, 869-70

22

(Tex. 2023), we leave analysis of Realme's gross-negligence claim to the court of appeals on remand.

## V

We reverse the court of appeals' judgment below and render judgment for the City as to Realme's ordinary negligence claim. We remand to the court of appeals for further proceedings consistent with this opinion.

Kyle D. Hawkins
Justice

**OPINION DELIVERED:** March 13, 2026